Winton LEMON, Plaintiff,

v.

BANK LINES, LTD., Defendant.

No. CV475-17.

United States District Court,
S. D. Georgia,
Savannah Division.

May 15, 1978.

James M. Thomas, Edwin D. Robb, Jr. (Bouhan, Williams & Levy), Savannah, Ga., for plaintiff.

Ralph O. Bowden, III (Hunter, Houlihan, Maclean, Exley, Dunn & Connerat), Savannah, Ga., for defendant.

## ORDER ON DEFENDANT'S MOTIONS FOR JUDGMENT N. O. V. AND NEW TRIAL

### I

LAWRENCE, District Judge.

In this diversity action the plaintiff longshoreman, Winton Lemon, obtained a jury verdict in the amount of $200,000 against Bank Line Ltd., the owner of the S.S. "Hazelbank," as a result of injuries received by him while performing longshoring work in the discharge of that vessel at Savannah on July 9, 1974.

The complaint alleges (and the evidence showed) as follows:

"7. The Plaintiff and other longshoremen with whom he was working, continued to discharge the cargo from the hold of the ship until about 3:00 P.M. The rolls of burlap and the bales of jute had been stacked in tiers in the hold of the vessel and the Plaintiff observed at that time that certain bales of jute, each of which weighed more than 100 pounds, appeared unsteady and were shaking precariously.

8. In order to prevent any of the bales of jute from falling on himself and the other longshoremen, and to keep the removal of cargo in progress, the Plaintiff found it both necessary and advantageous to go behind the bales and push them downward from their precarious position.

9. As the Plaintiff stepped down upon the wooden sweat battens to reach the bales of jute, one of the said sweat battens suddenly and unexpectedly broke causing him to fall, and causing the heavy bales of jute to fall on top of him, shattering his hard hat, knocking him down and inflicting upon him painful, permanent and disabling injuries."

The jury answered the following interrogatories submitted to it in the special verdict in the manner shown:

1. Was there negligence by the defendant shipowner in the method and manner of stowing the cargo in hold no. 2 of the "Hazelbank" proximately causing or contributing to plaintiff's injury?

Answer <u>Yes</u>

2. Was there negligence by the defendant shipowner proximately causing or contributing to plaintiff's injury as the result of failure to perform its duty to provide reasonably safe equipment, including sweat battens, for longshoremen working in hold no. 2?

Answer <u>No</u>

3. Was the plaintiff, Winton Lemon, contributorially negligent by reason of any failure on his part to exercise ordinary care for his own safety in the performance of his duties as a longshoreman which proximately contributed to his injury?

Answer <u>Yes</u>

4. If your answer to question 3 is "Yes," what was the percent (of 100%) of the negligence or fault attributable to the plaintiff, Mr. Lemon, in connection with his injury as compared to negligence of the shipowner?

Plaintiff <u>50%</u>

Shipowner <u>50%</u>

5. What is the total damage sustained by the plaintiff, that is, for pain and suffering, disability, loss of earnings, past and future, reasonable expenses, and other elements of recoverable damages recoverable by Mr. Lemon against the shipowner as the proximate result of his injuries?

<u>$400,000.00</u>

Bank Line Ltd. moved for judgment notwithstanding the verdict and, in the alternative, for a new trial. Among the grounds

urged by defendant is that it was guilty of no negligence that was the legal cause of plaintiff's injuries; that his own negligence in testing an obvious and known danger was the sole cause of his injuries or it combined with negligence of the stevedore as the proximate cause thereof; and that under the Longshoremen's and Harbor Workers' Compensation Act, as amended in 1972, no liability of a shipowner for improper stowage exists after the stevedore and its longshoremen begin the discharge of the vessel and the stevedore is in full control.

## II

More than a year has elapsed since this Court took defendant's motion under consideration. I have felt all along that the jury verdict in favor of plaintiff was in the teeth of the narrowed liability of shipowners that Congress intended to establish by the 1972 amendment to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b).

In 1977 the Fifth Circuit adopted as the governing rule in actions by longshoremen based on the negligent conduct of a shipowner the landside standards of liability for negligence which are formulated in Restatement 2d Torts Sections 342, 343 and 343A. The Court held that there could be no recovery for injuries where same are caused solely by the stevedore's negligence. See *Gay v. Ocean Transport & Trade, Ltd.,* 546 F.2d 1233 and *Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331. The Court of Appeals said in *Brown:*

"It would be unreasonable to expect members of the ship's crew, who are bound to have less knowledge about stevedoring operations than the stevedore's own employees, to recognize and remedy a nonobvious, technically dangerous situation where the stevedore's own supervisory personnel would not. Finally, not only was the plaintiff here acutely aware of the hazardous condition, but he was the person best able to appreciate the potential consequences of the danger and he was also in a position of personal control over it."

The purposes of the 1972 legislation include "elimination of the rubric of liability without fault for shipowners, and encouragement of safety within the industry by placing the duty of care on the party best able to prevent accidents." *Munoz v. Flota Merchante Grancolombiana, S. A.,* 553 F.2d 837, 839 (2nd Cir.). "[I]t is our judgment that a shipowner cannot be liable in damages when he relinquishes control of the hold, then in a reasonably safe condition, to an experienced stevedore . . . and the stevedore creates a latent, dangerous condition, unknown to the owner, upon which a longshoreman is injured." *Id.* 841. "[T]he shipowner is *not* the party best able to prevent accidents in situations such as presented here. It is the stevedore who, by the exercise of proper care, can best safeguard against unknown dangers lurking below in the deep recesses of the ship." *Valle v. Jugoslavenska Linejska Plovidba,* 434 F.Supp. 608 (S.D., N.Y.), citing *Munoz* at p. 839. In another district court decision involving the 1972 amendments, it is said: "The primary responsibility for the safety of the longshoreman lies with the stevedoring company. It is in the position best to provide for the safe unloading of the cargo. The stevedoring company is hired for its expertise in handling cargo safely and its personnel make all of the decisions as to how best to conduct the unloading." *Ramirez v. Toko Kaiun K. K.,* 385 F.Supp. 644, 653 (N.D., Cal.). See also *Hickman v. Jugoslavenska Linijska Plovidba Rijeka, ZVIR,* 570 F.2d 449 (2nd Cir.).

Up to May 4, 1978, no Fifth Circuit case bore any close factual resemblance to the claim of Mr. Lemon. In reaching a decision, I needed some clearer sign from above than had been given me. After all, there was no big hurry. The plaintiff longshoreman is drawing substantial compensation payments as a result of his injury and will do so for the rest of his life.

The hoped for manifestation from on high happened this month. It came in the form of the opinion of the Fifth Circuit in *Briley v. Charente Steamship Company, Ltd.,* 572 F.2d 498, in which the Court of

Appeals affirmed the grant of a summary judgment by the district court in a suit brought against a shipowner by a longshoreman who was employed by an independent stevedore.

The undisputed facts were that drums and boxes, loaded at another port, were stowed in the forward part of the hatch in a jumbled condition as though "just dumped there." The longshoreman gang had almost finished loading the hold when the plaintiff (Briley) climbed on top of the "pile" of drums and boxes in order to disengage a shackle hook. His foot became entangled in a large mesh net used by the longshoremen to cover the boxes. The nets which are supplied by the vessel for the stevedore's use serve to identify multiple loads and to indicate what cargo is to be discharged at different destinations. Plaintiff was injured when he fell into the space between the two groups of cargo. He contended that the shipowner was negligent because of its knowledge of the hazardous condition resulting from the presence of the separation nets in the hold.

In affirming the summary disposition of the case, the Fifth Circuit approved the following analysis of the case as stated by District Judge Sear of the Eastern District of Louisiana:

"[T]his entire scenario was within the sole control of the stevedore. In his deposition, the plaintiff admitted that the boxes upon which he was standing were jumbled in a pile. Rather than straighten them out he used this as a platform . . . The jumbled condition of the boxes was observed by plaintiff. It was within his power to correct that condi-

tion. And just like *Brown,* even if the ship personnel were aware of the hazard they were less capable of correcting the situation than the stevedore's own employees who knew about the danger and refused to rectify it."

### III

Of course, plaintiff's response to the foregoing is that the cargo was not safely stowed because the more desirable technique of "block" stowage was not utilized by the Indian stevedores—that is, the stowing of a particular commodity in one particular area of the vessel. Plaintiff contends that such method is safer than stowing the burlap rolls in the hold and filling the interstices with bales of jute and cross-stowing jute bales on top of the rolls. Counsel for Lemon argue that the ship's officers were aware of the method of loading but did not instruct the stevedores to use "block" stowage.[1] This was not only negligence, they contend, but the jury expressly found that it was and that it proximately caused or contributed to plaintiff's injury.

The Assistant Superintendent of Strachan's stevedoring department testified that it was not uncommon to stow jute bales and burlap rolls in the same hold. "What was uncommon is the—bales being the filler cargo." Mr. Stone said that it makes for "bad stowage from our standpoint." He added, "Of course, from their standpoint, they're trying to crowd as much cargo in the ship as possible, because that's the name of the game. . . ." Tr. 99–100. The stevedore foreman in charge of the unloading of the "Hazelbank," Charles

---

1. Whether or not the captain (or the first mate) of the chartered vessel possesses that power under Clause 8 of the charter party is open to doubt. The chief officer of the "Hazelbank" observed the loading of the cargo. He testified that he was not going to unduly interfere with the charterer's stevedores "unless I think that something very serious is going on." It was his duty to make sure that the ship leaves port stable and will arrive in a stable and upright position. Tr. 545.

Clause 8 provides: "The Captain (although appointed by the Owners) shall be under the orders and directions of the Charterers.

. . . Charterers are to load, stow and trim the cargo at their expense under the supervision of the Captain. . . ." Prior to the trial this Court granted a dismissal as to the time charterer, Isthmian Lines, Inc., which was then a defendant in the case. I did so on the strength of *Skou v. Herbert,* 365 F.2d 341, 351 (5th Cir.) in which it was said, "Time Charterer had no responsibility to Shipowner or to third persons including longshoremen for acts of omission or commission by the stevedores." For a recent decision in line with *Skou,* see *Migut v. Hyman-Michaels Company,* 571 F.2d 352 (6th Cir.).

A. Gross, Jr., testified that the filler method is not "a complete regular stow" but "not completely unusual." He recalled six or more occasions when jute ships with filler cargoes were stevedored by Strachan. Tr. 449. "We just handle it with caution as we can to get the cargo without damage." Tr. 416–17. Mr. Gross testified that in the case of the "Hazelbank" the "filler" bales were stowed "as neat as you could for that type cargo." Tr. 447–48. However, he said that the condition of the stow created "some hazard." Tr. 451.

Plaintiff's expert witness, Archibald F. Fraser, who is a marine surveyor, is of the opinion that the method of stow was improper and made it difficult for longshoremen to remove the cargo. Tr. 205–206.

The shipowner's expert, Charles L. Sullivan of Savannah, is a marine surveyor with eight years experience at sea. He stated that he probably did more "jute surveying than anybody in the country." Mr. Sullivan testified that the stowage was normal and acceptable and that it was a tight, good stowage. Tr. 522, 503, 507.

The Chief Officer of the "Hazelbank," John W. Robertson, had considerable experience in the stowage of jute cargoes during his fifteen years at sea. He observed the loading of the vessel in India. He characterized it as "a good stow"—in fact, "it was beautiful, really" and "the most logical way." Tr. 597, 569–70.

## IV

These warring opinions raise a factual issue as to whether the stow was proper. The jury found that it was not and further concluded that faulty stowage was causally connected to plaintiff's injury. To discover such a connection imposes a heavy tax on the legal mind. The jury necessarily found that the injury was a foreseeable and a natural and probable consequence of the debatable method of stowage adopted by the stevedores in India with the knowledge of the shipowner. Its finding imports that the shipowner should have foreseen that the stowage could eventuate in injury to a longshoreman who climbed down in the dark behind a stack of jute bales on battens (not intended to be used as a ladder) and that one of them would break under his weight (240 pounds).

Mr. Lemon testified, "If the sweat batten hadn't never broke, I'd of never been hurt that day." Tr. 144.[2] However, as to foreseeability the rule in *Restatement Torts* § 435 is that if the actor's conduct is a substantial factor in harm to another, the fact that the actor neither foresaw nor should have foreseen the manner in which the harm occurred does not prevent him from being liable.

The larger issue in this case, as I perceive it, is not causation. Rather the question is whether under the 1972 amendment to LHWCA the shipowner should have to answer in damages to a longshoreman employed by an independent stevedore which had complete charge and control of the unloading operation and was aware of hazards unknown to the officers or crew of the vessel.

The shaky condition of the stack of jute bales that Lemon was trying to push or kick over was known to the longshoremen. It was "leaning toward the midships" and the bales "were stuck in there all upside down." Tr. 122, 51, 130. The stack had become exposed after a "draft" of burlap rolls (they are 12 to 15 feet in length and each weighs around half a ton) had been lifted ashore. The condition of the particular stack was completely unknown to the shipowner which exercised no superintendence over the stevedoring operation. On prior occasions Strachan had handled jute stowage of the type used and knew that "some hazard" was connected with discharging cargoes so stowed. Under those circumstances, it undertook to perform the stevedoring operation on the "Hazelbank." The primary responsibility for the safety of its employees rested on the stevedore, not the vessel.

---

2. The jury found that defendant was not at fault in regard to the batten. We are therefore not concerned with any negligence of the vessel in that regard.

According to Lemon, there was "a big bow" in the stack and the bales were "about to fall." Tr. 136. He was unable to dislodge the bales with his hand hook. The use of the stevedore's gear was, he thought, dangerous. Apparently Strachan's foreman had been earlier informed of the general problem. Plaintiff testified that the stevedore foreman hollered down to the "header" in the hold to get it out "the best way he could." Tr. 137, 123. At any rate, without consulting the gang "header" or anyone else, plaintiff elected to knock over the stack of bales by climbing down at the rear thereof on the sweat battens.

■ The doctrines of contributory negligence and assumption of risk are not operable against a longshoreman in an action against the shipowner for negligence under LHWCA as amended. Here the plaintiff was best able to appreciate the potential consequences of danger and was in a position of personal control over it. The longshoreman knew that the stack was unsupported and shaky. The stevedore foreman on the deck was aware of the general conditions in the hold. The stevedore was in complete control of the unloading operation. The shipowner neither supervised it nor had a duty in that regard.

■ Returning to the recent decision of the Fifth Circuit in *Briley v. Charente Steamship Company, Ltd., supra*, this Court cannot distinguish between the fact situation existing there and here. To permit the verdict against the vessel to stand would, under the facts of this case, amount to an evisceration of the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act.

### ORDER

Defendant's motion for judgment N.O.V. is granted. In the alternative (should this Court be in error in that regard) the motion for new trial of defendant is granted on the general grounds, it being my conviction that the verdict is strongly against the weight of the evidence as well as contrary to law. In the event a new trial becomes necessary, the question of the shipowner's negligence in furnishing a defective sweat batten will not be re-litigated in the light of the finding of the jury as to that claim.

Judgment will be entered in accordance with this Order.