Obbie MALLARD and Daisy Mallard, his wife, Plaintiffs–Appellants,

v.

ALUMINUM COMPANY OF CANADA, LTD. et al., Defendants–Appellees.

Obbie MALLARD, Plaintiff,

Daisy Mallard, his wife, Plaintiff–Appellant,

v.

The M/V "GERMUNDO", a Finnish flag vessel, her engine, tackle and appurtenances, etc. In Rem; Rederiaktiebolaget Gustaf Erikson and Consolidated–Bathurst Limited, In Personam, Defendants–Appellees.

Obbie MALLARD and Daisy Mallard, his wife, Plaintiffs–Appellants,

v.

The M/V "GERMUNDO," etc., et al., Defendants–Appellees.

Nos. 79–1095, 79–1847 and 79–1922.

United States Court of Appeals, Fifth Circuit.

Jan. 15, 1981.

---

Reginald M. Hayden, Jr., George P. Telepas, Miami, Fla., for plaintiffs–appellants.

William B. Milliken, Miami, Fla., amicus curiae, for Rederiaktiebolaget Gustaf Erikson and Consolidated Bathurst.

Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, Fla., for defendants–appellees in 79–1095.

Todd A. Cowart, James E. Tribble, Miami, Fla., for defendants–appellees in all cases.

Fowler, White, Burnett, Hurley, Banick & Knight, Miami, Fla., for defendants–appellees in 79–1847 and 79–1922.

Before HENDERSON, POLITZ and WILLIAMS, Circuit Judges.

HENDERSON, Circuit Judge:

These are three consolidated appeals [1] arising from injuries sustained by the appellant, longshoreman Obbie Mallard, in a forklift accident while he was discharging cargo on the M/V Germundo in Port Everglades, Florida. Obbie Mallard and his wife Daisy Mallard appeal from an order dismissing the loading stevedore, Aluminum Company of Canada, Ltd. (hereinafter referred to as ALCAN), for lack of personal jurisdiction. They also appeal from an order granting summary judgment in favor of the vessel, its owner, and its charterer. Daisy Mallard appeals the order dismissing her claim for loss of consortium. [2]

---

1. No. 79–1095, *Mallard v. Aluminum Co. of Canada, Ltd.*; No. 79–1922, *Mallard v. M/V Germundo*; and No. 79–1847, *Mallard v. M/V Germundo*.

2. At oral argument, the parties agreed that the consortium question was answered by *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980) *affirming Alvez v. American Export Lines, Inc.*, 46 N.Y.2d 634, 415 N.Y.S.2d 979, 389 N.E.2d 461 (1979). In *Alvez* the United States Supreme Court held that the spouse of a harbor worker injured while serving a vessel in territorial waters had an action for loss of the spouse's society. This court has indicated that *Alvez* will apply retroactively. In a *per curiam* opinion in *Blanchard v. Teledyne Movible Offshore, Inc.*, 612 F.2d 971 (5th Cir. 1980), the court set aside the judgment dismissing a claim for loss of consortium and remanded in light of the fact that certiorari had been granted in *Alvez*. Similarly, the judgment dismissing Daisy Mallard's claim should be vacated and the cause remanded for disposition in accordance with the *Alvez* opinion.

The M/V Germundo was owned by Rederiaktiebolaget Gustaf Erikson (hereinafter referred to as ERIKSON), a Finnish corporation, and time–chartered to consolidated Bathurst, Ltd. (hereinafter referred to as CBL), a Canadian corporation, for the purpose of carrying newsprint from Port Alfred, Quebec, Canada, to Port Everglades, Florida, and Miami, Florida. CBL hired ALCAN as stevedore for the loading operations in Canada. ALCAN stevedored the vessel for a two–year period, from 1974 to 1975, during which time the vessel continuously ran cargos loaded with newsprint between Canada and one of the two Florida ports. On this particular voyage the discharging stevedore was Lavino Shipping Company (hereinafter referred to as LAVINO).

Newsprint is packed in tiers, with rolls "nested" end to end to produce the tightest stow possible. Discovery shows that on the subject voyage the newsprint was stored in this customary manner. The newsprint was stacked three tiers high. Then a double layer of plywood walking board was laid over the newsprint in a criss–cross fashion, one layer extending fore and aft and one layer abeam the vessel. This plywood formed a solid, level surface across which forklift trucks could maneuver while loading the next layers of newsprint and a surface upon which more newsprint could be stowed. After the hold was filled, the final tier of newsprint was squared into the space of the hatch by lowering the necessary number of rolls through the hatch opening.

Under its agreement with ALCAN, CBL provided the plywood walking boards used by ALCAN in loading the vessel. CBL also assumed general responsibility for the condition of and undertook inspection of the plywood. On return voyages to Canada, the ship's crew would conduct a routine inspection of the plywood and throw all worn or defective plywood overboard, but this examination constituted the extent of the shipowner's responsibility for the walking boards. Each board was further inspected by ALCAN as it was laid and any boards which the stevedore determined to be damaged were discarded and replaced with new plywood.

According to the chief mate's deposition, ALCAN's stevedoring personnel were actually in charge of getting the cargo into the M/V Germundo and properly stowed. The mate testified that he exercised no authority over the method by which the cargo was loaded or discharged, and that his concern was to insure that the cargo was loaded so as to be secure during the sea voyage. Ship's officers were not assigned to each hatch during the loading operation, nor were officers sent into the holds to look for damage to or correct improper stowage of cargo.

There is conflicting testimony on whether objections to the manner in which ALCAN loaded the newsprint had been lodged with the vessel owner prior to Mallard's accident. The chief mate said no one representing Florida's discharging longshoremen had reported instances of improper stowage to him. Yet a LAVINO employee stated that the vessel had received warnings previously that unless a tighter stow were achieved dangerous voids would occur.

At the time of his injury, Mallard was discharging cargo in Hold No. 1 of the M/V Germundo, the hold closest to the bow of the vessel. Several longshoremen testified that Hold No. 1 is a more dangerous hold within which to work because its peculiar configuration makes a uniformly tight stow difficult. The tier of newsprint squared in the hatch of Hold No. 1 had already been removed at the time of Mallard's injury. He was operating his forklift atop the plywood walking boards in the center of Hold No. 1. He had removed one roll of newsprint and was backing away from the tier, when the plywood beneath the right wheel of the forklift either broke or gave way. The wheel slipped into an unusually large void beneath the newsprint rolls stowed below, and the forklift toppled on its side, pinning Mallard underneath and so seriously injuring his lower torso that he will probably be permanently confined to a wheelchair. The vessel's chief mate was

unable to relate the circumstances of the accident. Neither he nor the other ship's officers were supervising the discharge operations at Hold No. 1.

Mallard brought suit against ALCAN, and against ERIKSON and CBL, for negligence in permitting old, worn out plywood to be used and in ignoring the presence of unreasonably large voids between the newsprint rolls in Hold No. 1. Mallard stated that the boards appeared to be "in good condition for working on." Other members of the LAVINO crew, however, characterize the condition of the boards as "old and worn out," "thin, real thin," "frazzled" and "rotted." The void was almost uniformly described as being at least one and a half feet by two feet in area, as opposed to the average gap of approximately six inches. It was hidden from view by the plywood boards. All deponents agree that Mallard was operating the forklift in a careful fashion; contributory negligence is not an issue.

In response to ALCAN's motion to dismiss, Mallard asserted that the federal district court could exercise personal jurisdiction over ALCAN in Canada via the Florida Long–Arm Statute.[3] The district court, however, dismissed Mallard's suit against ALCAN in its entirety for lack of personal jurisdiction over ALCAN and we affirm that decision. Each federal court is empowered to utilize the jurisdictional statutes of the state in which it presides. *Gordon v. John Deere Co.*, 466 F.2d 1200 (5th Cir. 1972); *Woodham v. Northwestern Steel & Wire Co.*, 390 F.2d 27 (5th Cir. 1968). *See generally,* 2 Moore's Federal Practice ¶ 4.41–1[3], at 4–666 (2d Ed. 1979). The

court's authority is limited, however, to the scope of the state's statute, even if it does not reach as far as federal due process allows. Florida's Long–Arm Statute, in relevant part, exerts jurisdiction over any nonresident who causes injury to persons or property in Florida by act or omission in another state, if products that the nonresident processed, serviced or manufactured cause injury during use or consumption in Florida. Florida state courts have repeatedly held that the Florida statute requires more activities or contacts to sustain personal jurisdiction than demanded by the Constitution. *Youngblood v. Citrus Associates of the New York Cotton Exchange, Inc.,* 276 So.2d 505 (Fla. 4th Dist.Ct.App. 1973). *See Escambia Treating Co. v. Otto Candies, Inc.,* 405 F.Supp. 1235 (N.D.Fla. 1975). Furthermore, language setting forth the contacts required by long–arm jurisdictional statutes must be strictly construed. *American Baseball Cap, Inc. v. Duzinski,* 308 So.2d 639 (Fla. 1st Dist.Ct.App.1975). In light of these considerations, we hold that the Florida statute, Fla.Stat.Ann. § 48.193(1)(f)(2) (West 1973), is intended to reach out–of–state manufacturers in products liability actions. Where, for example, a car has been repaired out–of–state and some time later the repairs fail during an in–state sojourn causing injury, personal jurisdiction over the out–of–state repairman is concededly present under this statute. *Jack Pickard Dodge, Inc. v. Yarbrough,* 352 So.2d 130 (Fla. 1st Dist.Ct.App. 1977).[4] But the statutory language cannot be so expansively read as to embrace ALCAN's activity in the instant case. ALCAN merely loaded a vessel. The stevedoring

---

**3.** Fla.Stat.Ann. §§ 48.193(1)(b), .193(1)(f) (West 1973). Section 48.193(1)(b) addresses circumstances in which an act within the state causes injury within the state. This section has been broadly construed by this court in instances where the tortious activity was the sort to which a precise situs cannot be designated. *Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd.,* 543 F.2d 1107 (5th Cir. 1976), *Rebozo v. Washington Post Co.,* 515 F.2d 1208 (5th Cir. 1975). The facts here may be distinguished from those present in *Bangor Punta* and *Rebozo.* Although the vessel's situs was continually shifting from Canada to Florida and

all points in between, the negligence clearly occurred in Canada.

**4.** Application of the statute must still meet "traditional notions of fair play and substantial justice," however. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945). Because Jack Pickard Dodge Inc. did not engage in business in Florida and its only connection with the state was the servicing of the car which was eventually operated within the state, the long–arm statute was unconstitutional as applied to it. 352 So.2d at 133.

company did not service a product in any common sense understanding of the phrase. Nor was Obbie Mallard "using" or "consuming" either the vessel or its newsprint.

We next address the Mallards' appeal from the summary judgment granted by the district court in favor of ERIKSON and CBL. Under the 1972 Amendments to the Longshoremen and Harbor Workers Compensation Act, 33 U.S.C.A. § 905(b) (1978), a longshoreman is entitled to recover damages for those injuries caused by the negligence of the vessel.[5] The district court concluded that ALCAN, as loading stevedore, had full responsibility and control over the stowage of the newsprint, and that neither CBL, as time charterer, nor ERIKSON, as vessel owner and employer of her crew, had a duty growing out of these operations. To hold the charterer or vessel owner liable under 33 U.S.C.A. § 905(b) (1978) for negligent failure to correct the dangerous stowage condition as one of which he should have known, said the court, would portend a return to absolute liability under a negligence standard akin to the doctrine of unseaworthiness which Congress sought to abolish by the 1972 amendments.[6] Instead, the district court adopted a § 905(b) standard of care defined by land-based principles of negligence, in light of which it held that only the loading stevedore was negligent, for only he had a duty to discover and remedy perilous situations caused by improper stowage.

We endorse the district court's use of the land-based negligence standard. In

5. Section 905(b) granting a right of action to longshoremen injured by negligence of the "vessel" includes recovery for an act or omission of the time charterer as well. *Migut v. Hyman–Michaels Co.*, 571 F.2d 352 (6th Cir. 1978). Generally, however, a time charterer, one who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise. *Habrat v. United States*, 310 F.Supp. 618 (W.D.Pa.1970), *Klishewich v. Mediterranean Agencies, Inc.*, 302 F.Supp. 712 (E.D. N.Y.1969). The CBL charter states that although it is a nondemise charter under which the owners "remain responsible for the navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account," the "charterers are to provide necessary dunnage and shifting boards . . ." and the "charterers are to load, stow and trim and discharge the cargo at their expense under supervision of the captain . . . ." *D/S Ove Skou v. Hebert*, 365 F.2d 341, 351 (5th Cir. 1966), *cert. denied* 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970), cited by appellees, holds that the third cited clause makes a charterer responsible for the costs of cargo handling, but in and of itself does not transfer operational responsibility from the owner. (Compare *Fernandez v. Chios Shipping Co., Ltd.*, 542 F.2d 145 (2d Cir. 1976) which upheld an indemnity claim by the vessel owner against the time charterer on the basis of this provision where the cause of the personal injury was directly related to loading or discharging cargo.) In light of *Skou*, this circuit seems reluctant to find any shift of operational responsibility for personal injuries to the time charterer absent clear language to that effect. Thus, the second clause enumerated may impose on the charterer the financial responsibility for providing dunnage of the necessary quality without placing on him the obligation to pay damages for personal injury that the dunnage may cause. *See generally, Wyche v. Oldendorff*, 284 F.Supp. 575 (E.D.Va.1967). In any case, liability cannot be transferred to the time charterer unless the vessel owner originally had responsibility.

6. Section 905(b) reads:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C.A. § 905(b) (1978).

*Gay v. Ocean Transport & Trading Ltd.*, 546 F.2d 1233 (5th Cir. 1977), this circuit adopted as its § 905(b) negligence prototype the Restatement (Second) of Torts §§ 343, 343A (1965) which set forth the duties owed by possessors of land.[7] *Gay* concluded that the Restatement (Second) provisions satisfied the several policy considerations that motivated the 1972 amendments by encouraging vessel owners to promote safety or suffer liability for their negligence and by placing the employee injured aboard a vessel in the same position he would occupy if he were injured ashore during nonmaritime employment. Cases in this circuit follow § 343 and § 343A with unerring consistency. *Roberts v. Andrew Martin Sea Services, Inc.*, No. 78–2219 (5th Cir., May 30, 1980); *Stockstill v. Gypsum Transportation*, 607 F.2d 1112 (5th Cir. 1979), *app. pending* 49 U.S.L.W. 3119 (Aug. 26, 1980); *Wiles v. Delta Steamship Lines, Inc.*, 574 F.2d 1338 (5th Cir. 1978); *Samuels v. Empresa Lineas Maritimas Argentinas*, 573 F.2d 884 (5th Cir. 1978), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979); *Briley v. Charente Steamship Co., Ltd.*, 572 F.2d 498 (5th Cir. 1978); *Brown v. Mitsubishi Shintaku Ginko*, 550 F.2d 331 (5th Cir. 1977); *Lemon v. Bank Lines Ltd.*, 449 F.Supp. 1016 (S.D. Ga.1978).

Our negligence standard as expressed in the Restatement (Second) bifurcates into two levels of vessel owner responsibility which correspond to whether the risk–fraught condition is latent or obvious. Cases in this circuit which address responsibility for injury arising from obviously dangerous situations turn on the issue of control. To be extracted from these cases is the general pronouncement that the shipowner need not answer in damages to "a longshoreman employed by an independent stevedore which had complete charge and control of the unloading operation and was aware of hazards unknown to the officers or crew of the vessel." *Lemon*, 449 F.Supp. at 1020. If "either the stevedore or his employee is in [a] better position to appreciate fully the [obvious] risk and avoid the danger, particularly where the danger is within the control of the stevedore's own employees," the vessel owner will not be liable. *Stockstill v. Gypsum Transportation*, 607 F.2d at 1117. To enable the vessel owner to insulate himself from liability for obvious defects by agreeing to relinquish control of the work area to the stevedore, however, would thwart Congress' intent to retain a negligence action against the vessel owner. *Lopez v. A/S D/S Svendborg*, 581 F.2d 319 (2d Cir. 1978). The fact that the hazard–causing injury is open and obvious to the stevedore in control of operations will not absolve the vessel owner of responsibility if the vessel owner "should anticipate the harm despite such . . . obviousness [of the defect]" and still fails to correct it. *See Gay v. Ocean Transport & Trading Ltd.*, 546 F.2d at 1242; Restatement (Second) of Torts § 343A (1965).

Where the hazard is latent and nonobvious, the stevedore's control over loading or discharge is less relevant because he is in no better position to know of the risks than the vessel owner. In such situa-

---

7. These sections, under the title on the special liability of possessors of land to invitees, provide:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
 (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
 (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
 (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343 (1965).
 (a) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
 (2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated. Restatement (Second) of Torts § 343A (1965).

tions, knowledge of the vessel owner, rather than control of the stevedore, should be the focus of inquiry. In defining the scope of what the vessel owner "should know," we remain cognizant of Congress' abolition of longshoremen's actions based upon unseaworthiness. Congress did not intend that the vessel owner be charged with knowledge of any latent defect on the vessel, since such a theory of liability would approach the unseaworthiness standard. Because it was concerned that courts might continue to hold vessels strictly liable for hazards by viewing any unseaworthy conditions as negligence, Congress stressed that negligence should be determined by traditional non–maritime standards. The Restatement (Second) criteria of negligence subject a shipowner to liability only if he knows or has reason to know of an unreasonably dangerous condition on the vessel of which the longshoreman is probably not aware and fails to exercise reasonable care to make the condition safe or warn the longshoreman.[8] As explained in *Slaughter v. Ronde*, 390 F.Supp. 637 (S.D.Ga.1974), *aff'd*, 509 F.2d 973 (5th Cir. 1975), where a

longshoreman was injured by shifting cargo, Congress, through passage of the 1972 Amendments, did not intend to derogate from the maritime law imposing liability on a vessel owner whose officers "see or have actual visual notice of, or ample time to observe, unsafe stevedoring operations" and do not take corrective action. 390 F.Supp. at 640. Heretofore, precedent in this circuit has required a showing of a real opportunity for knowledge to be gained during reasonably careful operation of the vessel before it is said that a vessel owner "should have known" of a nonobvious hazard posing danger to longshoremen engaged in stevedoring activities.[9]

As a matter of law, the applicable negligence standard, be it focused on control of the stevedore or knowledge of the vessel owner, is contingent upon whether a hazard is obvious or latent. The deposition testimony is replete with glaring contradictions as to the plywood's condition. The boards are at once described as "in good condition" and as "old and worn out." Consequently, the appearance of the ply-

---

**8.** *Id.*

**9.** The appellees would have us hold that shipowner liability could only be based on actual knowledge of a hazard and failure to correct or warn. Under this approach, a vessel owner who was not reasonably observant and did not actually learn of the defect would benefit from his inattentiveness by avoiding liability. A shipowner's liability clearly must extend to those dangerous conditions of which he has actual notice plus those of which he should have notice by an exercise of reasonable care. The meaning of "reasonable care" within the shipping industry must be adduced in light of the special problems arising during the carriage of goods by sea. The reasonable care standard does not include the duty to actively supervise loading work. *Price v. S.S. Yaracuy*, 378 F.2d 156 (5th Cir. 1967). *Slaughter v. Ronde* states, "Reasonable care does not require ship's officers to inspect each hold daily to be sure that the 'stevedore has properly performed the work which it was hired to perform and that they inspect so thoroughly that they discover a danger which is not readily apparent and which is not appreciated by the longshoremen themselves.'" 390 F.Supp. 637, 644 (S.D.Ga.1974) *aff'd*, 509 F.2d 973 (5th Cir. 1975) (quoting *Williams v. Bowring Steamship Co.*, 1972 AMC 890, 897 (D.Conn.1972). But if there is evidence that the ship's crew has conducted an inspection which either led to or should have led to the discovery of a perilous condition, the vessel owner may be negligent. *Samuels v. Empresa Lineas Maritimas Argentinas*, 573 F.2d 884 (5th Cir. 1978), *cert. denied* 443 U.S. 915, 99 S.Ct. 3106, 61 L.Ed.2d 878 (1979). *Cf. Slaughter v. Ronde, supra* (no actual supervision, therefore no liability, even though master of the vessel had final say—so as to cargo location and either he or crew could complain of unsafe loading practices). The Second Circuit searches for evidence of knowledge in cases of injury by nonobvious hazards also. *See Ruffino v. Scindia Steam Navigation Co.*, 559 F.2d 861 (2d Cir. 1977), *Munoz v. Flota Merchante Grancolombiana, S.A.*, 553 F.2d 837 (2d Cir. 1977). *Ruffino* held generally that a shipowner cannot be liable for a nonobvious dangerous condition created by the independent stevedore, unless he has actual or constructive knowledge of it. Specifically, the court concluded that the shipowner was entitled to a directed verdict because there was no evidence it had actually supervised minute details of the loading operation or that it was required to do so in such a way that it would have gained knowledge of the hazard.

wood walking boards in the present case is an issue of fact. Whether the boards were obviously or latently defective must be resolved before the proper standard by which to assess liability can be ascertained.[10] For this reason we find that summary judgment is inappropriate here. *See Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

Therefore, we affirm the dismissal for lack of personal jurisdiction of the claims against ALCAN in No. 79–1095. We reverse the summary judgment in favor of ERIKSON and CBL and remand in No. 79–1922 for further proceedings consistent with this opinion. We vacate the judgment denying Daisy Mallard's suit for loss of consortium in No. 79–1847 and remand for disposition in accordance with the *Alvez* decision.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

---

10. If the boards were obviously hazardous, ERIKSON and CBL may be absolved of liability if the evidence demonstrates that LAVINO, the stevedore in control, or Mallard was in a better position to appreciate fully the hazard and avoid the danger so that the vessel owner had no reason to anticipate harm. *Stockstill v. Gypsum Transportation*, 607 F.2d at 1117, Restatement (Second) of Tort § 343A (1965). On the other hand, if the boards appeared to be sturdy and sound, judgment in favor of ERIKSON and CBL may not be justified if it is shown that the vessel owner had actual or constructive knowledge of the latent condition. No evidence of actual knowledge of danger by the shipowner has been advanced by the Mallards. However, they have produced testimony by several longshoremen that the vessel had been warned that newsprint on earlier voyages was stowed in a dangerous fashion. Such actual notice of inadequate loading would prompt a reasonable person to make periodic inspections during future operations so that he might have knowledge of stowage conditions. The failure to inspect would constitute negligence and any hazardous conditions would be those of which the vessel "should have known." The vessel's chief mate gave conflicting testimony that the discharging stevedores had never notified him of stowage problems from previous voyages. Since our function is not to resolve the factual issues, however, we do not decide which version is correct. *United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).