Charles D. ETHERIDGE, et al.

v.

SUB SEA INTERNATIONAL, INC.

Civ. A. No. 91–2219.

United States District Court,
E.D. Louisiana.

Nov. 17, 1992.

---

Roy H. Maughan, Maughan, Atkinson & Martin, Baton Rouge, La., Eldon E. Fallon, Stevan C. Dittman, Madeleine Marie Landrieu, Gainsburgh, Benjamin, Fallon, David & Ates, New Orleans, La., T. Mack Brabham, McComb, Miss., for plaintiffs Charles D. Etheridge and Pamela Etheridge.

Bruce D. Burglass, Jr., Michael J. Rocks, Lemle & Kelleher, New Orleans, La., for defendants Sub Sea Intern., Inc. and Odeca Oil and Gas Co.

Wood Brown, III, John Christopher Person, Arthur Gordon Grant, Jr., Frederick Theodore Haas, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for defendant Cross Marine Inc.

## ORDER AND REASONS

FELDMAN, District Judge.

The defendant, Sub Sea, moves for summary judgment on the ground that the plaintiff was not assigned to an identifiable fleet of vessels and cannot be a Jones Act seaman. This motion forces a question: when does the admiralty law elevate form over substance? The answer, in this case, is when courts try to define what is a "fleet" of vessels in the context of the Fifth Circuit's seaman status test.

### Background

Charles Etheridge was employed by Sub Sea as an offshore welder and pipe fitter. Sub Sea and Cross Marine own and operate lift boats for hire by companies which own and service offshore oil and drilling platforms. Odeco regularly chartered Sub Sea and Cross Marine lift boats when repair work was needed on its platforms. Both Sub Sea and Cross Marine, as well as several other lift boat companies, had written master service agreements with Odeco. These agreements defined the relationship between Odeco and the lift boats. The charters themselves were oral. Whether the charters were, in retrospect, time charters or voyage charters, it is certain that they were not bareboat charters; each charter included an operating crew provided by the vessel owner. Odeco did not have hands-on operational control of the vessel, but it did determine the work mission and destination of each chartered lift boat.

Mr. Etheridge claims he was injured while working aboard a lift boat that had been chartered by Odeco in conjunction with work that Odeco was doing on oil platforms in the Gulf of Mexico. He was part of the contract labor provided by Sub Sea, but at the time he was injured the lift boat in question was under charter to Odeco from Cross Marine. Mr. Etheridge was essentially a member of Odeco's labor force, working off various lift boats Odeco chartered. During the seventeen months that the plaintiff worked for Sub Sea before his accident, he worked on fixed structures offshore on twenty two occasions, working aboard thirteen lift boats owned by six different and unrelated companies. This work, however, was predominantly for one customer: Odeco. The plaintiff estimates that 92% of his time was spent

aboard Odeco-chartered lift boats, performing Odeco work, on Odeco production facilities, on Odeco wells and leases. This motion argues that these formally unconnected vessels, unconnected by common ownership, were not a "fleet" for purposes of the Fifth Circuit's seaman status test, and that, in spite of the maritime character of Mr. Etheridge's work, he cannot be a seaman under the Jones Act. Causing form to be elevated over substance, the current case literature demands that the motion must be granted.

### A.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Put more positively, a genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *See id.* Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In evaluating the summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. *Anderson*, 477 at 255, 106 S.Ct. at 2513.

The defendant argues that the plaintiff cannot meet the test for seaman status

established by the Fifth Circuit in *Offshore Co. v. Robison*, 266 F.2d 769 (5 Cir.1959) because the plaintiff was not assigned to an "an identifiable group of vessels acting together or under one control." *See Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067 (5 Cir.1986). This motion focuses on one new issue of law: whether a time charterer of several unrelated vessels has the kind of common control over the vessels needed to meet the vessel connection prong for the Fifth Circuit test of seaman status.

### B.

The *Robison* test for seaman status has become a reverential mantra for admiralty lawyers. We begin with Judge Wisdom's now-famous words:

> [T]here is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel ... and (2) if the capacity in which he was employed ... contributed to the function of the vessel or to the accomplishment of its mission.

*Offshore Co. v. Robison*, 266 F.2d 769, 779 (5 Cir.1959). Thirty-one years later, the Supreme Court blessed the doctrinal approach of *Robison* in *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). At issue in this case is the course of the later progeny of *Robison* which, in fine tuning the concept of permanency, have applied the seaman's protections to those who work aboard not a single vessel, but a group or fleet of vessels under one control. *See Barrett v. Chevron U.S.A., Inc.*, 781 F.2d 1067. This evolution has been accompanied with some conceptual vacillation. *Barrett* provides one example:

> By fleet we mean an identifiable group of vessels acting together or under one control. We reject the notion that fleet in this context means any group of vessels an employee happens to work aboard. Unless fleet is given its ordinary meaning, the fundamental distinction between members of a crew and transitory maritime workers ... is totally obliterated.

*Id.* at 1074. But whose ordinary meaning? The phrase is left undefined, as if given to universal understanding. Thus, admiralty lawyers on both sides of a dispute often draw their arguments selectively from *Barrett* and conclude that *Barrett* supports, somewhat, each side.

■ The question in this case seems to be one of first impression. Can a group of vessels chartered by the same company over a period of time to complete a common work mission for that company constitute a fleet if the charter was on a time charter basis and the charterer did not have hands-on operational control over the vessels?[1] It is certain that if Odeco had owned the lift boats it chartered over the seventeen month period during which the plaintiff worked aboard these vessels, the vessels would constitute a fleet. The result would apparently be the same if the charters were on a bareboat basis. But the result this Court must reach is driven by cases that require the Court to look at the formalistic distinction of what kind of charter did the parties adopt.

### C.

■ Odeco, on whose charters the plaintiff spent nearly all his time, chartered lift boats on a short term need basis from a group of ten lift boat companies. The vessels all had common missions for Odeco. But the very nature of the charter meant that the lift boat was randomly selected each time, depending on the company from whom Odeco chose to charter and the availability of lift boats at a specific time. The lift boat company chose the boat that Odeco would lease and the crew that came with it. Even in light of the unity of Odeco and the vessels, and the common mission of the vessels, the nature of the charter arrangement and a faithful application of the cur-

rent case literature compel this Court to grant this motion.

The Fifth Circuit has repeatedly held that transient offshore maritime workers who work on numerous vessels that are owned and controlled by several different companies are not entitled to seaman status, even in instances in which the worker or his employer had temporary control of the vessel. *See Campo v. Electro–Coal Transfer Corp.*, 970 F.2d 51 (5 Cir.1992) (worker at a cargo transfer facility whose employer had temporary but partial control of thousands of unconnected, separately controlled barges held not to establish common control); *Bach v. Trident Steamship Co. Inc.*, 920 F.2d 322 (5 Cir.1991) (compulsory river pilot who had complete control when piloting and who worked on numerous vessels on the Mississippi held not to have a attachment to an identifiable fleet); *Ardleigh v. Schlumberger, Ltd.*, 832 F.2d 933 (5 Cir.1987) (employee who worked offshore on thirty different vessels denied seaman status); *Langston v. Schlumberger Offshore Services, Inc.*, 809 F.2d 1192 (5 Cir.1987) (worker who performed work on fifteen vessels belonging to ten different owners not a seaman). Even though the plaintiff spent up to 92% of his time working aboard vessels doing Odeco missions in the Gulf, *Bach* and *Campo* and the others dictate that these lift boats cannot be defined as a fleet merely because Odeco chartered the vessels. The plaintiff must show that Odeco controlled the lift boats. And that leads to an inquiry into the consequences of the charter structure.

During the period of the charter, the lift boat remained at all times in the hands-on operational control of the crew employed and assigned by the lift boat company, which alone had the power over personnel decisions. The charter was in the nature of a time charter. At the time of the accident, for example, Cross Marine, as

---

1. Defendants rely rather strongly on the favorable decision of an administrative law judge. The Benefits Review Board upheld the ALJ decision rejecting an employer's "general control" argument and affirmed that the claimant did not work aboard an identifiable fleet of vessels where the employer contracted with independently owned and operated vessels to do its

work. These vessels were not owned or operated as a unit. *See Nix v. Hope Contractors, Inc.*, 25 BRBS 180 (December 27, 1991). This decision, of course, has no binding effect on this Court, but it should be noted as one result consistent with that reluctantly reached by this Court.

owner of the lift boat in question, furnished the captain and crew that operated the vessel. The lift boat's crew had authority over management and navigation decisions. Odeco could tell the captain where to go and why, but it had no control over how to get there and could not order the captain to operate the boat in a certain way.

The Court is tempted to interpret "control" realistically; to formulate a concept of constructive control. These lift boats, after all, were not operating for the pleasure of the crew. They were dedicated to Odeco's economic goal and commercial mission. It was the customer, the charterer, who directed the crew about where to go and it was certainly the charterer's work that was done once the lift boats arrived at their designated destination. Such thinking, however intuitive, seems unacceptable under the decided cases because, instead, they draw their answer from the nature of the charter and the allocation of control inherent in a time or voyage charter.

■ Most important, and ultimately determinative, then, is the fact that these charters were either time charters, voyage charters or some hybrid, but certainly not bareboat charters. Form carries the day. A bareboat charter is one, as all know, in which the charterer crews the vessel. The bareboat charterer is an owner pro hac vice and has unrestricted use of the vessel. *See Kerr–McGee Corporation v. Ma–Ju Marine Services, Inc.,* 830 F.2d 1332, 1342 n. 11 (5 Cir.1987). But in this case the lift boat companies always provided the crew and retained hands-on operational control; it cannot be said that these were bareboat charters.[2] In giving meaning to the control factor here, this Court is compelled by *Kerr–McGee* to be mindful of the traditional allocation of responsibility between a time charterer and vessel owner.[3] *See id.*

at 1339–43. Although Odeco directed the commercial activities of the lift boats, and set the mission of the vessels, the owner of the lift boat retained the responsibility for ship navigation and management. The retention of these central responsibilities by the lift boat owner meant continuing duties of care and corresponding exposure to liability not shared by the charterer. The owner of the lift boat, and the owner alone, is responsible for navigation errors. *See Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1372 (5 Cir.1983). Additionally, the owner, and the owner alone, is responsible for the seaworthiness of the vessel. *See Moore v. Phillips Petroleum Co.,* 912 F.2d 789, 792 (5 Cir.1990) (under the time charter, the owner bears a continuing responsibility for the seaworthiness of the vessel). Finally, the owner of the vessel is also solely responsible for the negligence of the crew. *See Mallard v. Aluminum Co. of Canada, Inc.,* 634 F.2d 236, 242 n. 5 (5 Cir.1981) (time charterer "assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise."). Implicit in this allocation of liability is further recognition that the vessel owner remains in control of the vessel under a time charter. This Court cannot lightly alter this long recognized understanding.

The Court is admittedly somewhat troubled that the formalism of a time charter as opposed to ownership or bareboats can have the simplistic effect of avoiding the application of the Jones Act. The economic incentive to one like Odeco to time charter its vessels dramatically increases. *Bach* and *Campo,* read with *Kerr–McGee,* result in a gap in Jones Act coverage. The common control-connection axis results in mischief by becoming an artificial and misleading article of faith in the test for seaman status when defining the element of fleet.

---

**2.** Had these charters been bareboat charters, there would be no question that Odeco controlled these vessels and that they would then be an identifiable fleet.

**3.** *Kerr–McGee* explains that one must look at the traditional allocation of responsibility between time charterer and vessel. In the time charter

context, unlike bareboats, possession and control remain with the vessel owner although the charterer determines destination and routes. *Id.* at 1340. Although *Kerr–McGee* was a Longshore Act case, its explanation of control as it relates to time charters cannot be ignored when presented in a *Bach–Campo* setting.

Courts would be better instructed (and would better serve the cause of justice) to be guided by the fact-particular circumstances in question, and their commercial reality. That was the voyage started by *Robison;* a voyage *Wilander* signed on as a passenger.[4] Commercial reality says these vessels were functionally a fleet for Odeco; the commonality of economic purpose says they were a fleet; their unity of mission suggests a fleet. Only the formal difference between time charters and bareboat charters says differently. But *Bach* and *Campo* center themselves on the thinner thread of control. One may well wonder whether this truly results in the "ordinary meaning" caution of *Barrett.* No matter, this Court cannot ignore the decided cases (or improvise a false distinction).

The motion for summary judgment must be GRANTED.

---

**4.** It is instructive to return to Judge Wisdom's message in *Robison:*

Attempts to fix unvarying meanings ... to such terms as 'seaman', 'vessel', 'member of a crew', must come to grief on the facts. *Robison,* 266 F.2d at 779.