Timothy J. KOPKE, Plaintiff-Respondent,

UNITED STATES FIDELITY & GUARANTY COMPANY, a foreign insurance corporation and Leicht Transfer and Storage Co., a Wisconsin corporation, Subrogated-Plaintiffs-Respondents,

v.

A. HARTRODT S.R.L., a foreign corporation, Defendant,

CARTIERE BINDA IN LIQUIDAZOINE S.P.A., a foreign corporation, Defendant-Third-Party Plaintiff-Respondent,

SOCIETA' COOPERATIVA L'ARCIERE, a foreign corporation, Defendant-Appellant,

v.

RIUNIONE ADRIATICA DI SICURTA S.P.A., a foreign corporation, Third-Party Defendant-Respondent.

Supreme Court

*No. 99–3144. Oral argument April 30, 2001.—Decided July 10, 2001.*

2001 WI 99

(Also reported in 629 N.W.2d 662.)

398

For the defendant-appellant there were briefs by *W.H. Levit Jr., Winston A. Ostrow, Michael B. Apfeld* and *Godfrey & Kahn, S.C.*, Milwaukee, and oral argument by *Michael B. Apfeld*.

For the plaintiff-respondent there was a brief (in the court of appeals) by *Lee J. Geronime, David A. Krutz, Leslie C. Mastey* and *Michael Best & Friedrich LLP*, Milwaukee, and oral argument by *Chris J. Trebatoski*.

For the defendant-third-party plaintiff-respondent there was a brief (in the court of appeals) by *Trevor J. Will, Eric J. Massen* and *Foley & Lardner*, Milwaukee, and oral argument by *R. George Burnett*.

For the third party-defendant-respondent there was a brief by *Frank J. Daily, Daniel J. La Fave* and *Quarles & Brady LLP*, Milwaukee, and oral argument by *Daniel J. LaFave*.

¶ 1. WILLIAM A. BABLITCH, J. Societa' Cooperativa L'Arciere (L'Arciere), an Italian cooperative, challenges the exercise of *in personam* jurisdiction over it. This challenge presents two inquiries: (1) Whether the facts presented satisfy Wisconsin's long-arm statute, Wis. Stat. § 801.05(4) (1997–98)[1] ; and (2) Whether L'Arciere has "minimum contacts" with this State such that the court's exercise of jurisdiction would be fair and in accordance with the Fourteenth Amendment's due process requirements. We conclude that the requisite tests to establish personal jurisdiction over L'Arciere are satisfied. Accordingly, we affirm the ruling of the circuit court.

## FACTS

¶ 2. In May of 1997 Timothy J. Kopke (Kopke), a truck driver, was seriously injured when he opened a cargo container in Neenah, Wisconsin. The injury

---

[1] All subsequent statutory references are to the 1997–98 volume, unless otherwise indicated.

occurred when a pallet loaded with paper fell out of the cargo container and onto Kopke. The paper had been shipped to Neenah from Crusinello, Italy, by its manufacturer, Cartiere Binda in Liquidazione, S.p.A. (Binda). The paper had been purchased from the Binda's Crusinello mill by CTI Paper USA, Inc. (CTI). CTI had been purchasing paper product from the Crusinello mill since 1991.

¶ 3. CTI is not a party to this action, although it supplied damage reports on cargo containers received from Binda. Forty-four damage reports were issued between August 1996 and September 1997.

¶ 4. In 1995 Binda entered into a contract with L'Arciere, an employee-owned Italian cooperative, to provide workers to load product into cargo containers. L'Arciere workers and Binda employees each played a role in the loading of product into cargo containers.

¶ 5. Binda employees would place the paper to be shipped on pallets and cover it with shrink-wrap. Binda's setup department prepared loading plans for the containers. Binda produced loading plans for five of the shipments occurring between November 1996 and May 1997. At the top of these plans is written either "Cont. X CTI Appleton," "Contenitore X CTI" or Contenitore X Neenah." Kopke explains that "Contenitore," or "cont." as it is abbreviated, is an Italian word meaning "container" and "X" is an abbreviation for "per," meaning "to." "Contenitore X CTI Appleton" identifies a container as being loaded for shipment to CTI in Appleton.

¶ 6. In conformity with the loading plan, L'Arciere workers moved the pallets into the cargo container. The L'Arciere workers placed the pallets into the cargo container and secured it using boards,

bracing beams, and inflated air bags to fill side spaces. Binda supplied these packing materials.

¶ 7. After Kopke sustained his injury he brought a claim for damages against Binda, L'Arciere, and others. L'Arciere moved to dismiss for lack of personal jurisdiction. Brown County Circuit Court Judge William M. Atkinson denied this motion. Judge Atkinson ruled that L'Arciere's acts of stabilizing the products being shipped by surrounding the product with air bags, and installing bracing beams and boards into the cargo container, were acts that were part of a processing of a product. The circuit court judge was also satisfied that the minimum contacts requirement for due process purposes was met.[2] L'Arciere appealed. The court of appeals accepted L'Arciere's appeal, and subsequently the court certified the appeal to this court pursuant to Wis. Stat. (Rule) § 809.61.

## ANALYSIS

¶ 8. One issue is presented: Did the circuit court err by denying a motion to dismiss for lack of personal jurisdiction over L'Arciere? Every personal jurisdiction issue requires a two-step inquiry. *In re Liquidation of All-Star Ins. Corp.*, 110 Wis. 2d 72, 76, 327 N.W.2d 648 (1983) (discussing personal jurisdiction pursuant to Wis. Stat. § 645.04(5)(a)); *Lincoln v. Seawright*, 104 Wis. 2d 4, 10–11, 310 N.W.2d 596 (1981). It must first be determined whether defendants are subject to jurisdiction under Wisconsin's long-arm statute. *See Lincoln*, 104 Wis. 2d at 10. If the statutory require-

---

[2] Judge Atkinson also denied L'Arciere's motion for summary judgment. This decision on summary judgment is not presented for review here.

ments are satisfied, then the court must consider whether the exercise of jurisdiction comports with due process requirements. *Id.* "[P]laintiff has the minimal burden of establishing a prima facie threshold showing that constitutional and statutory requirements for the assumption of personal jurisdiction are satisfied." *Ammon v. Kaplow*, 468 F. Supp. 1304, 1309 (D. Kan. 1979). In this review, we may consider documentary evidence and weigh affidavits in reaching a determination as to whether this burden has been met. *Id.* "Factual doubts are to be resolved in favor of the plaintiff." *Id.* We begin our analysis with consideration of Wisconsin's long-arm statute.

¶ 9. Wisconsin Stat. § 801.05(4) authorizes the exercise of personal jurisdiction over nonresidents whose act or omission committed outside of Wisconsin gives rise to an injury within the state. All the participants to this appeal agree that if the courts have personal jurisdiction over L'Arciere, it arises under § 801.05(4)(b), set forth below:

> A court of this state having jurisdiction of the subject matter has jurisdiction over a person served in an action pursuant to s. 801.11 under any of the following circumstances:
>
> . . .
>
> (4) Local injury; foreign act. In any action claiming injury to person or property within this state arising out of an act or omission outside this state by the defendant, provided in addition that at the time of the injury, either:
>
> . . .
>
> (b) Products, materials or things processed, serviced or manufactured by the defendant were

used or consumed within this state in the ordinary course of trade.

¶ 10. Application of Wis. Stat. § 801.05(4)(b) to the facts of this case presents a question of law, which we review independently. *Marsh v. Farm Bureau Mut. Ins. Co.*, 179 Wis. 2d 42, 52, 505 N.W.2d 162 (Ct. App. 1993). Wisconsin's long-arm statute is liberally construed in favor of jurisdiction. *Id.* (citing *Lincoln*, 104 Wis. 2d at 9). The plaintiff must carry the burden of establishing jurisdiction. *Lincoln*, 104 Wis. 2d at 9.

¶ 11. The dispute here is focused upon whether L'Arciere engaged in conduct described in Wis. Stat. § 801.05(4)(b). Kopke asserts that L'Arciere engaged in "processing." In support of his position, Kopke relies upon *Nelson by Carson v. Park Industries, Inc.*, 717 F.2d 1120 (7th Cir. 1983). In *Nelson*, the Seventh Circuit Court of Appeals examined § 801.05(4)(b) (1981–82) and concluded that "the word 'processed' should be interpreted to include a distributor's purchase and sale of goods in the normal course of the distribution of those goods." *Id.* at 1124. The court then further defined "to process" as follows:

> The verb "to process" certainly may refer to the narrower concept of preparing something in the sense of manufacturing it. However, it also has the broader definitions of subjecting something to a particular system of handling to effect a particular result and preparing something for market or other commercial use by subjecting it to a process. *See* Webster's Third New International Dictionary of the English Language (1963). We think these broader definitions include the actions of a distributor such as [the defendant], i.e., purchasing and

selling goods in the ordinary course of trade in a distribution system.

*Id.* at 1124 n.5

¶ 12. Kopke asserts that the activities performed by L'Arciere at the Binda mill with respect to the paper product falls directly within the definition of "process" set forth in *Nelson*. L'Arciere had an exclusive contract with Binda to load product at the mill. Kopke points out that damage reports produced by CTI show that L'Arciere loaded at least 45 cargo containers for shipment to Wisconsin; 39 of which arrived between November 1996 and May 1997.[3] He argues that L'Arciere processed the product for shipment to Wisconsin when it loaded and secured the product in the cargo container. This loading was, in Kopke's view, a necessary function in preparing the product for market, for the product would not have arrived in Neenah, Wisconsin, without the loading performed by L'Arciere.

¶ 13. In rebuttal, L'Arciere asserts that the ordinary understanding of the word "process" as it is used in Wis. Stat. § 801.05(4)(b) means an action directed toward the transformation of the object being processed. It contends that this meaning is supported by dictionary definitions, the placement of the word "process" with "manufactured" and "serviced" in the statute, and by examining how the legislature used the word "process" elsewhere in the Wisconsin statutes.

¶ 14. A narrow interpretation of the word "process" is also urged by third-party defendant-respondent Riunione Adriatica di Sicurta' S.p.A.

---

[3] These numbers represent only the number of containers shipped to Wisconsin in which cargo had been damaged. A receiving damage report was faxed to Binda for each cargo container that had damaged goods. Containers that did not have damaged cargo were not reported in CTI's documents.

411

(RAS). RAS, an Italian insurance company, issued a policy to Binda. RAS asserts, however, that even under L'Arciere's more narrow interpretation its activities constitute processing of materials under Wis. Stat. § 801.05(4)(b).

¶ 15. The question presented is, therefore, whether the word "process" means to bring about a physical transformation upon the products, materials, or things themselves, as urged by L'Arciere and RAS, or whether process is a broader term as suggested by the Seventh Circuit in *Nelson*, and by Kopke and Binda. We agree with Kopke and Binda.

¶ 16. "The fundamental rule of construction of a statute is to ascertain and give effect to the intention of the legislature as expressed in the statute." *Zarnott v. Timken-Detroit Axle Co.*, 244 Wis. 596, 599–600, 13 N.W.2d 53 (1944). Wisconsin Stat. § 801.05 does not define the word "process." The legislature has set forth as a general rule that "words and phrases shall be construed according to common and approved usage . . . ." Wis. Stat. § 990.01(1). "The common and approved usage of words can be established by the definition of a recognized dictionary." *Milwaukee County v. Dep't of Indus., Labor and Human Relations Comm'n*, 80 Wis. 2d 445, 450, 259 N.W.2d 118 (1977). L'Arciere cites the definition of "process" from *Random House Webster's Unabridged Dictionary* 1542 (2d ed. 1998), defining process as " '—v.t. **10.** to treat or prepare by some particular process, as in manufacturing.' " The analysis adopted in *Nelson*, urged by Kopke, relied upon *Webster's Third New International Dictionary of the English Language* (1963) for its determination that "to process" may refer to "the broader definitions of subjecting something to a particular system of handling to

effect a particular result and preparing something for market or other commercial use by subjecting it to a process." *Nelson*, 717 F.2d at 1124 n.5. The dictionary, therefore, does not resolve the question of whether a broad or narrow meaning should be applied to the word "process."

¶ 17. When reasonable minds could differ as to the meaning of a statute, the court examines the scope, history, context, subject matter and purpose of the statute in question. *Brauneis v. LIRC*, 2000 WI 69, ¶ 21, 236 Wis. 2d 27, 612 N.W.2d 635. Wisconsin's long-arm statute was designed to satisfy the requirements of due process. *Schmitz v. Hunter Mach. Co.*, 89 Wis. 2d 388, 403, 279 N.W.2d 172 (1979). The 1959 revision notes state that the statute incorporates grounds that expand the exercise of personal jurisdiction in cases having substantial contacts with this state. Revision Notes—1959 by G.W. Foster, Jr. for St. 1959, § 262.05, Wis. Stat. Ann. § 801.05 (West 1977).[4] Because the objective of the statute was to expand personal jurisdiction we conclude that the broad definition of "process" suggested by *Nelson*, 717 F.2d at 1124 n.5, properly reflects the legislative intent in adopting this statute. Further, this definition is in keeping with this court's consistent statement that "statutes regulating long-arm jurisdiction are. . .to be given a liberal construction in favor of the exercise of jurisdiction." *Schroeder v. Raich*, 89 Wis. 2d 588, 593, 278 N.W.2d 871 (1979). Accordingly, we adopt that broad definition here. As a result, we agree with Kopke that L'Arciere engaged in

---

[4] The Wisconsin Rules of Civil Procedure were renumbered by Supreme Court Order, 67 Wis. 2d 595, 592–96 (1975) (eff. January 1, 1976).

processing pursuant to Wis. Stat. § 801.05(4) and affirm this conclusion by the circuit court.

¶ 18. L'Arciere presents several additional arguments against this conclusion, which we find unpersuasive. L'Arciere points out that the word "processed" appears in numerous other statutes, ranging from processing dead animals Wis. Stat. § 95.72(1)(c)3 to processing controlled substances Wis. Stat. § 961.571(1)(a). L'Arciere does not argue that these statutes are in any way cross-referenced or linked together with Wis. Stat. § 801.05, other than that in its view these statutes use "process" as a concept distinct from packing, packaging, or related concepts. There are limits as to how much and what kind of statutory context is relevant to the analysis of a particular word in an individual statutory section. "The risk of misunderstanding as a result of allowing irrelevant portions of a text to influence the meaning attributed to the segment of text being construed is probably just as risky as taking any statement out of context." 2A Norman J. Singer, *Statutes and Statutory Construction* § 47:02, at 211 (6th ed. 2000). We conclude that this attempt to determine the meaning of "process" in subsection (4)(b) by examining the word as it appears in other sections throughout the statutory code distorts, rather than clarifies, legislative intent in creating § 801.05. Without something more, such as one statute being incorporated into another, or two statutes addressing closely related subjects that consideration of one would logically bring the other to mind, "[e]very statute is an independent communication, for which either the intended or the understood meaning may be different." 2A *id.* § 45.14, at 110.

414

Accordingly, we do not concur with this statutory analysis argument.

¶ 19. Further, although L'Arciere correctly points out that "process" appears with "manufactured" and "serviced" it does not necessarily follow that "process" is to be interpreted as meaning "a transformation as occurs in manufacturing." " 'It is an elementary rule for the construction of statutes that effect must be given, if possible, to every word, clause, and sentence thereof.' " *Greenebaum v. Dep't of Taxation,* 1 Wis. 2d 234, 238, 83 N.W.2d 682 (1957) (quoting *State v. Columbian Nat. Life Ins. Co.,* 141 Wis. 557, 566, 124 N.W. 502 (1910)). Were we to conclude that "process" is merely a restatement of "manufacturing," we would render "process" a redundancy. However, by adopting the broader meaning of the word, it is properly given effect in the statute.

¶ 20. Finally, L'Arciere cites to a decision by the Fifth Circuit interpreting Florida's long-arm statute which apparently contains language similar to Wis. Stat. § 801.05(4). In *Mallard v. Aluminum Co. of Canada,* 634 F.2d 236 (5th Cir. 1981), a longshoreman was severely injured in Florida while unloading cargo from a vessel. The vessel was owned by a Finnish corporation and time-chartered to Bathurst, Ltd., a Canadian corporation. Bathurst hired the Aluminum Company of Canada, Ltd. (ALCAN) as stevedore for the loading operations in Canada. The injured longshoreman brought a claim of negligence against ALCAN and other defendants. ALCAN brought a motion to dismiss for lack of personal jurisdiction, which the district court granted. The Fifth Circuit affirmed, concluding that the Florida long-arm statute could not reach ALCAN. The court wrote that the rele-

vant Florida statute "exerts jurisdiction over any nonresident who causes injury to persons or property in Florida by act or omission in another state, if products that the nonresident processed, serviced or manufactured cause injury during use or consumption in Florida." *Id.* at 241.

¶ 21. Despite the apparently similar language in the Florida statute and Wis. Stat. § 801.05(4), the jurisdictions differ on two critical rules of statutory interpretation that formed the basis of the decision in *Mallard*. First, Florida's long-arm statute is strictly construed. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996). In contrast, Wisconsin's long-arm statute is liberally construed in favor of the exercise of jurisdiction. Second, Florida courts have held that "the statute requires more activities or contacts to sustain personal jurisdiction than demanded by the Constitution." *Mallard*, 634 F.2d at 241. In contrast, this court has stated that § 801.05 was designed to satisfy the requirements of due process. Therefore, we do not find the analysis in *Mallard* persuasive for the purposes of interpreting Wisconsin's long-arm statute. We conclude, therefore, L'Arciere falls within the grasp of Wis. Stat. § 801.05(4).[5]

¶ 22. Having concluded that L'Arciere falls within reach of Wis. Stat. § 801.05(4), we turn now to consider the constitutional inquiry. The Due Process Clause of the Fourteenth Amendment limits the exercise of jurisdiction by a state over a nonconsenting

[5] Kopke and Binda also argue that L'Arciere "serviced" the paper within the meaning of Wis. Stat. § 801.05(4)(b). Having resolved this issue on the basis of the statute's use of the word "processed," we need not address this argument.

nonresident. Section 801.05(4) has been interpreted as a codification of federal due process requirements.[6] Compliance with the statute presumes that due process is met, subject to the objecting defendant's opportunity to rebut. *Lincoln*, 104 Wis. 2d at 10. Thus, when jurisdiction is found pursuant to the statutory analysis, the defendant may dispute the presumption of compliance with due process requirements articulated by the Supreme Court. *See Hasley v. Black, Sivalls & Bryson, Inc.*, 70 Wis. 2d 562, 577, 235 N.W.2d 446 (1975) ("The burden is not on the defendant to prove lack of contact with this state. . .even though the motion to dismiss is produced by the defense; the defendant may dispute the contacts alleged or attack the demonstrated statutory compliance on due process grounds.").[7] The limits of due process are, of course, established by the rules set forth in the decisions of the United States Supreme Court. *Zerbel v. H.L. Federman & Co.*, 48 Wis. 2d 54, 60, 179 N.W.2d 872 (1970).

¶ 23. Due process analysis presents two inquiries. The first inquiry is whether the defendant "purposefully established minimum contacts in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). On this question, the plaintiff carries the burden. *Id.* If this inquiry is answered affirmatively, then the defendant's forum-state contacts "may be considered in light of other factors to determine

[6] *Lincoln v. Seawright*, 104 Wis. 2d 4, 10, 310 N.W.2d 596 (1981).

[7] We disagree with the statement in *Marsh v. Farm Bureau Mutual Insurance Co.*, 179 Wis. 2d 42, 53, 505 N.W.2d 162 (Ct. App. 1993) that the burden switches to the defendant to show that jurisdiction fails to comport with due process requirements of the Fourteenth Amendment.

whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Id.* at 476 (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 320 (1945)). The defendant carries the burden on this question.[8] *Burger King,* 471 U.S. at 477 ("[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").[9]

¶ 24. We turn then to apply the first inquiry of our due process analysis to the facts of this case. Under the Due Process Clause, personal jurisdiction over a nonresident defendant is proper when the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

[8] Although in the United States Supreme Court's most recent decision involving personal jurisdiction a majority of the Justices agreed upon only the "fair play and substantial justice" standard, the opinion did employ the two-part inquiry articulated in *Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985). *See Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102 (1987).

[9] In *Zerbel v. H.L. Federman & Co.,* 48 Wis. 2d 54, 64–65, 179 N.W.2d 872 (1970), this court adopted a five-factor test for due process. These factors are: "the quantity of contacts with the state, the nature and quality of the contacts, the source of the cause of action, the interest of Wisconsin in the action, and convenience." *Lincoln,* 104 Wis. 2d at 11. We conclude that these factors are encompassed within the framework set forth by the United States Supreme Court in personal jurisdiction cases decided subsequent to our decision in *Zerbel.* Accordingly, we set aside the *Zerbel* factors and apply Supreme Court precedent here.

*Int'l Shoe Co.*, 326 U.S. at 316 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts requires that " 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." ' *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). Essential to each case is " 'that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "purposeful availment" requirement has become the "baseline," the primary focus, of the minimum contacts analysis. *Clune v. Alimak AB*, 233 F.3d 538, 542 (8th Cir. 2000). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " *Burger King*, 471 U.S. at 475 (citations omitted). A defendant's contact with the forum state must be such that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen*, 444 U.S. at 287.

¶ 25. As an additional component of analysis, the litigants in this case assert that the stream of commerce theory of personal jurisdiction articulated in *World-Wide Volkswagen* and in subsequent Supreme Court cases applies here. In *World-Wide Volkswagen* and *Burger King* the Court explained:

> "[I]f the sale of a product of a manufacturer or distributor. . .is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market

for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Cf. Gray v. American Radiator & Standard Sanitary Corp.*, 22 Ill. 2d 432, 176 N.E.2d 761 (1961).

*World-Wide Volkswagen*, 444 U.S. at 297–98; *see also Burger King*, 471 U.S. 473. Kopke asserts that personal jurisdiction is established under the stream of commerce theory because (1) L'Arciere routinely loaded cargo containers for shipment to Wisconsin; (2) this destination was indicated on the plans used by L'Arciere in loading pallets of paper into the containers; and, (3) that these facts establish conduct and connection with this forum such that L'Arciere could reasonably anticipate being brought into court here when Kopke unloaded the container in Wisconsin and a pallet fell out and caused injury.

¶ 26. The relevance of the stream of commerce test in personal jurisdiction analysis is related to the issue of forseeability. In *World-Wide Volkswagen* the Supreme Court found the concept of forseeability insufficient to serve as a basis for personal jurisdiction under the Due Process Clause. *Asahi Metal Indus. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987). Yet, as noted by Justice O'Connor in *Asahi*, in *World-Wide Volkswagen* "[t]he Court disclaimed. . .the idea that 'forseeability is wholly irrelevant' to personal jurisdiction. . .," and determined that the exercise of personal

jurisdiction does not offend the Due Process Clause when a product is introduced into the stream of commerce with the expectation that it will be purchased in the forum State. *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297–98).

¶ 27. In *Asahi*, the Supreme Court divided over the correct application of the stream of commerce theory. *Asahi* concerned an indemnity action by a Taiwanese manufacturer, Cheng Shin, against Asahi, a Japanese business. Cheng Shin manufactured tire tube and Asahi manufactured the tube's valve assembly. These products were incorporated into motorcycle tires. While the motorcycle was operated in California, the tire exploded, severely injuring the driver and killing the passenger. A product liability suit was filed in that state, and Cheng Shin was named as a defendant. The underlying tort action was settled and dismissed. Asahi sought to quash the indemnity action, arguing that exercise of personal jurisdiction violated due process.

¶ 28. The California Supreme Court held that personal jurisdiction did not offend due process because of Asahi's placement of its product in the stream of commerce by delivering them to Cheng Shin in Taiwan, combined with Asahi's awareness that some of Cheng Shin's tires would reach California. The United States Supreme Court reversed.

¶ 29. In analyzing *Asahi*, four members of the Court, Justice O'Connor, joined by Chief Justice Rehnquist, Justice Powell and Justice Scalia, concluded that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Under

this view, the " 'stream-of-commerce-plus' theory,"[10] there must be "additional conduct" by the defendant to meet the burden of establishing personal jurisdiction. *Asahi*, 480 U.S. at 112. However, Justice Brennan, joined by Justices White, Marshall, and Blackmun, stated that this showing of "additional conduct" was not needed.[11] According to Justice Brennan:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacturer to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. Nor will the litigation present a burden for which there is no corresponding benefit. A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity. These benefits accrue regardless of whether that participant directly conducts business in the forum State, or engages in additional conduct directed toward that State. Accordingly, most courts and commentators have found that jurisdiction premised on the placement of a product into the stream of commerce is consistent with the Due Process Clause, and have not required a showing of additional conduct.

---

[10] *Ruston Gas Turbines, Inc., v. Donaldson Co.*, 9 F.3d 415, 420 (5th Cir. 1993).

[11] Justice Stevens concluded that an examination of minimum contacts was unnecessary. In his view exercise of jurisdiction over *Asahi* would be "unreasonable and unfair" even if the defendant had engaged in purposeful activities in the forum State. *Asahi*, 480 U.S. at 121.

*Id.* at 117 (Brennan, J. concurring). Ultimately, a majority in *Asahi* concluded that the exercise of personal jurisdiction would not be reasonable or fair and accordingly violated due process. In total, "*Asahi* stands for no more than that it is unreasonable to adjudicate third-party litigation between two foreign companies in this county absent consent by the nonresident defendant." *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 614 (8th Cir. 1994).

¶ 30. We believe the stream of commerce theory as set forth by Justice Brennan is the correct analysis to apply to the case at hand. First, as the Seventh Circuit has noted, a majority of the Court has not rejected the stream of commerce analysis of *Burger King* and *World-Wide Volkswagen*, and it is thus binding upon the lower courts. *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 947 (7th Cir. 1992); *see also Ham v. La Cienega Music Co.*, 4 F.3d 413, 416 n.11 (5th Cir. 1993) ("Absent rejection by a majority on the Supreme Court, we have continued to apply the stream of commerce analysis found in our pre-*Asahi* cases.").

¶ 31. Second, although Kopke is not asserting a strict product liability claim, but is instead alleging negligence, we nevertheless conclude that the stream of commerce analysis should be applied here.[12] Kopke's injuries arose out of commercial activities and the distribution of goods in the stream of commerce. Specifically, Kopke was injured in Neenah, Wisconsin, when he opened an ocean-going cargo container and a pallet loaded with paper fell out; Kopke asserts that

---

[12] A discussion of the distinction between a claim grounded upon strict product liability and a claim grounded upon negligence is set forth in *Fuchsgruber v. Custom Assessories, Inc.*, 2001 WI 81, 244 Wis. 2d 758, 628 N.W.2d 833.

L'Arciere workers in Italy negligently loaded the pallet into the container that was shipped to this forum. Further, the facts of this case present a "regular course of dealing that results in deliveries" of multiple units of the product into this forum over a period of years. *See Asahi*, 480 U.S. at 122 (Stevens, J. concurring in part and concurring in the judgment).

¶ 32. Applying that test to the present case, we conclude based upon the nature of the contractual relationship between L'Arciere and Binda, the identification in the loading plans of the cargo's destination as "Appleton" and "CTI Neenah," as well as the damage reports from CTI which illustrate a not insignificant volume of business between CTI and Binda, the exercise of personal jurisdiction complies with the limits of due process because the cargo was introduced into the stream of commerce with the expectation that it would arrive in this forum.

¶ 33. First, we note L'Arciere had a contract with Binda to supply workers for the purpose of loading cargo containers. L'Arciere employees worked together in Italy with Binda employees to load the cargo containers. This is not a case like *Asahi* where a manufacturer operating in one international forum shipped parts to a second manufacturer in a different international forum, who incorporated these parts into a product that is shipped to yet a third international forum. In the present case, Kopke asserts that L'Arciere was negligent in the manner in which it loaded the cargo container in Italy, and that this negligence caused or contributed to causing his injuries when the cargo container was opened here in Wisconsin.

424

¶ 34. Second, the loading instructions prepared by Binda and used by L'Arciere identified the container's destination as "Neenah" or "CTI Appleton." In other words, these products did not randomly or fortuitously appear in Wisconsin; they were specifically intended to arrive in this forum. The injury that Kopke suffered occurred in the forum to which the cargo containers were directed to arrive.

¶ 35. Third, the damage reports prepared by CTI on cargo containers received from Binda between November 8, 1996, and May 20, 1997, demonstrate that at least 40 containers were loaded by L'Arciere workers for delivery in this forum.

¶ 36. We also note that L'Arciere, by virtue of its business relationship with Binda, benefited from the distribution of Binda products to this forum. "A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Asahi*, 480 U.S. at 117 (Brennan, J. concurring). We recognize that this economic benefit arose because L'Arciere contracted with Binda to perform a service, the loading of cargo containers. In providing this service L'Arciere interacted with Binda employees and handled the final product that was being shipped to this forum. L'Arciere's handling of the final product is the alleged act of negligence that may have caused Kopke's injuries. The product was shipped here as a result of the sale agreement between Binda and CTI. As a result of this sales agreement, the cargo container arrived in Wisconsin and Kopke was subsequently injured here. These business relationships benefited L'Arciere, and L'Arciere literally "played a hand" in the product arriving in this state. Under these

circumstances, we think it reasonable to conclude that the purposeful availment requirement is met and that L'Arciere has sufficient minimum contacts with this forum to be held accountable here if any negligence on its part in loading the cargo containers has resulted in damages.

¶ 37. In attacking this conclusion L'Arciere's principal argument is that the defendant must be aware that the product will end up in the forum state. In its view, actual knowledge of a product's destination is essential for the exercise of personal jurisdiction and that L'Arciere did not know where Neenah or Appleton are located. For his part, Kopke asserts that L'Arciere had actual or at least constructive knowledge of the products' destination, which is sufficient for the purposes of minimum contacts.

¶ 38. Other court's have considered an analogous argument in personal jurisdiction cases where an argument is presented distinguishing between "know" and "should have known:"

> "The traditional equivalence between "know" and "should have known" in our jurisprudence suggests that, for purposes relevant to this case, it is a distinction that makes no difference. The ultimate test of in personam jurisdiction is "reasonableness" and "fairness" and "traditional notions of fair play and substantial justice [*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)]. In applying such a test, it is a matter of common sense that there should be no distinction between "know" and "should have known." We cannot say that a potential defendant who actually knows his products will ultimately reach the forum state any more "purposefully avails

itself of the privilege of conducting activities [there]," Hanson v. Denckla, 357 U.S. [235, 253, 78 S.Ct. 1228, 1240, 2 L.Wed. 2d 1283 (1958)], than a potential defendant who merely *should have known*."

*Barone*, 25 F.3d at 613 n.4 (quoting *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 200 (5th Cir. 1980)). We find this reasoning applicable to L'Arciere's argument concerning the distinction between "knowledge" and "actual knowledge" in this case; its argument raises a distinction that makes no difference.

¶ 39. Having concluded that Kopke has met his burden to establish minimum contacts for the exercise of personal jurisdiction over L'Arciere, we turn next to a consideration of the second inquiry for personal jurisdiction, application of the standard of fair play and substantial justice. The Supreme Court has identified the following factors as relevant to the analysis of whether personal jurisdiction is reasonable: (1) the forum state's interest in adjudicating the dispute; (2) the plaintiff's interest in obtaining convenient and effective relief; (3) the burden on the defendant; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, (5) the shared interest of the several States in furthering fundamental substantive social policies. *Asahi*, 480 U.S. at 113; *World-Wide Volkswagen*, 444 U.S. at 477. The first three factors are relevant to our analysis of this case.

¶ 40. As to the first factor, the State of Wisconsin has an unquestionable interest in providing its citizenry with a forum to adjudicate claims arising here.

¶ 41. As to the second factor, Kopke, who suffered a spinal cord injury causing permanent quadriplegia, has an undeniable interest in obtaining

convenient relief. We also believe Kopke has a right to effective relief. This point brings us to consideration of an argument presented by RAS, who asserts that basic consideration of fairness weigh in favor of dismissing L'Arciere. According to RAS, the sole reason Kopke wants L'Arciere to remain in this action is not because he believes it has any liability, but because of his concern that Binda will attempt to use L'Arciere's "empty chair" to deflect blame at trial. We are not persuaded. A strategic decision on the part of plaintiff's or defense counsel does not weigh in as a factor in our due process analysis.

¶ 42. The third factor which we will consider is the burden on the defendant. L'Arciere contends that it would be unfair and unjust to exercise personal jurisdiction over a party that merely packs or loads goods onto a truck or vessel. In its view, subjecting L'Arciere to jurisdiction in this forum would subject all packing and portage companies, stevedores, and longshoremen to nationwide, even worldwide, jurisdiction. In support of this position, L'Arciere cites three cases in which a court determined that the minimum contact requirement of personal jurisdiction analysis was not satisfied, *American President Lines, Ltd. v. Metropolitan Stevedore Services*, 567 F.Supp. 169 (W.D. Wash. 1983); *Real Properties, Inc. v. Mission Insurance Co.*, 427 N.W.2d 665 (Minn. 1988); and *Global Servicios, S.A. v. Toplis & Harding, Inc.*, 561 So. 2d 674 (Fla. Ct. App. 1990). Because in each of these cases the minimum contacts inquiry was not satisfied we do not have the benefit of the court's consideration of the exercise of personal jurisdiction under the "fair play and substantial justice" prong, and, therefore, these cases provide little assistance to our analysis. Nonetheless, we will

briefly examine each of the three cases cited by L'Arciere.

¶ 43. In *American President Lines* the defendant stevedore loaded and stowed cargo onto a vessel in California. The vessel, enroute to its destination of Bhavnagar, India, arrived in Seattle. While in Seattle a negligent stow required a lengthy layover for clean-up and restowage. The federal district court determined that the exercise of personal jurisdiction in Washington State would be impermissible. First, it determined that the loading of cargo in California "not of such a nature that it can be said to put defendant on notice that it might be called to defend such actions at any port at which the vessel may call." *Id.* at 170–71. Second, the court found that "[t]he circumstance that the vessel's owner elected to dock in Seattle is insufficient to support the assertion of jurisdiction over defendant under Washington's long-arm statute." *Id.* at 171. Third, the court rejected application of the stream of commerce theory because the stevedore "did not utilize the owner of the vessel it loaded as a distributor of its 'products' and thus did not take advantage of an indirect marketing scheme and received no economic benefit, either direct or indirect, from the residents of Washington." *Id.*

¶ 44. In *Real Properties* the Minnesota Supreme Court found no personal jurisdiction over a New Jersey company. The New Jersey company had been hired by a Minnesota firm, Barrett Moving & Storage (Barrett), to package Chinese art pieces for shipment. The Barrett drivers loaded the crates onto Barrett trucks and Barrett hauled the goods from New Jersey to Minneapolis, Minnesota. Upon arrival in Minneapolis it was discovered that many of the art pieces were broken. In the ensuing court action, the plaintiff argued that the

New Jersey firm's negligence in packing caused the breakage. The question decided by the Minnesota Supreme Court was whether or not the New Jersey company had sufficient contacts with the forum state to permit it to exercise personal jurisdiction. *Real Properties*, 427 N.W.2d at 667. The court did not find the minimum contacts inquiry satisfied and did not analyze the "fair play and substantial justice issue."

¶ 45. Finally, in *Global Servicios* a Columbian corporation, working in Columbia, packed household goods and forwarded for shipment. "The goods were packed in Columbia by Global, flown to Miami by Lineas Aereas del Caribe (LAC), stored in Miami by Inter-American, and trucked to New Jersey by Pride Movers, Inc." *Id.* at 674. The goods were damaged at some point in this process. The federal district court concluded that Global did not have sufficient minimum contacts with Florida to subject it to jurisdiction in that state. The court noted that Miami is the port of entry for air cargo from Columbia. It concluded that Global's contact with Florida was "merely fortuitous and was made yet more tenuous by LAC's air transport of the goods from Bogota to Miami and by Inter-American's storage of the goods once they reached Miami." *Id.* at 675.

¶ 46. In the case at hand, the cargo container's arrival in Wisconsin was not "merely fortuitous" as was the passage of goods through Miami in *Global Servicios* or, arguably, the docking of a vessel in Seattle in *American President Lines*. The goods were purchased by CTI and intended for delivery in this forum; the goods did not fortuitously, randomly, or even erringly appear here. In contrast to the events in *Real Properties*, this was not a one-time transaction. CTI had been purchasing Binda's products since 1991; L'Arciere was loading cargo containers under contract with Binda from 1996

through May of 1998. During this period, numerous cargo containers were packed by L'Arciere, destined for Wisconsin. Thus, we conclude that L'Arciere was not an anonymous entity packing goods for shipment somewhere in the global marketplace. As a result, we conclude that the mere fact that the activity L'Arciere engaged in was packing cargo containers does not automatically make the exercise of personal jurisdiction unfair. The larger question, and what we believe L'Arciere is attempting to argue, is whether a nonresident, unconsenting business entity engaged in loading or stowing goods will always avoid personal jurisdiction because it is unfair or unreasonable. We decline to adopt the "per se" analysis offered by L'Arciere.

¶ 47. In considering the burden on the defendant, we of course recognize that like the defendant in *Asahi*, the defendant here is located beyond our national boundaries and will have to defend itself in a foreign nation's judicial system. L'Arciere also contends that, as in *Asahi*, the real dispute is between two nonresidents, Binda and L'Arciere. The contract between Binda and L'Arciere contains a choice of forum provision and L'Arciere contends that determination of this dispute in this forum would violate that agreement. We find, however, that the feature that distinguishes *Asahi* from the case at hand is that in *Asahi*, the injured plaintiff, a California resident, was no longer a part of the action, having reached a settlement agreement. Therefore, we do not view this case as merely one between two nonresident parties. Kopke is still a party, and very interested. Further, the facts of *Asahi* are substantially different from the present case. The Supreme Court found it unfair to exercise personal jurisdiction over a Japanese manufacturer of parts,

who sold its product to a Taiwanese manufacture, who subsequently incorporated those parts into a product that was sold in California. The present case does not present an analogous sale of goods scenario. Accordingly, we conclude that the unfairness found by the Court in *Asahi* is not present here.

¶ 48. In sum, the defendant must make a "compelling case" that other consideration make the exercise of jurisdiction unreasonable. *Burger King*, 471 U.S. at 477. We conclude that L'Arciere has not met this burden. As a result, we affirm the circuit court and conclude that personal jurisdiction over L'Arciere is permissible under both the Wisconsin long-arm statute and the Due Process Clause of the Fourteenth Amendment. The case is remanded to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The order of the circuit court is affirmed.

¶ 49. N. PATRICK CROOKS, J. *(dissenting).* I join the dissent of Justice DIANE S. SYKES, however, I write separately as to the majority's conclusion that the evidence here establishes minimum contacts. If what the majority concludes qualifies as minimum contacts is indeed sufficient, then there is, in effect, nothing left of the doctrine of minimum contacts, which would limit the reach of a state court's jurisdiction. According to the majority, a foreign company or organization need only provide a service to establish minimum contacts, even though the evidence presented fails to establish that that foreign company or organization had any knowledge that it was processing a product for arrival in a particular forum. *See* majority op. at ¶ 37. The potential implication of the

majority's decision today on foreign trade is significant and cannot be ignored. Indeed, the *United States Supreme Court may need to settle finally the scope of the stream of commerce test.* The majority has woven a justification for finding that L'Arciere is subject to this state's jurisdiction, notwithstanding the limits of due process. There is very little, if anything, to tie L'Arciere to Wisconsiň, certainly nothing that it "should reasonably anticipate being haled into court" here. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980).[1]

¶ 50. I respectfully disagree with the majority's conclusion that Kopke met his burden of establishing the requisite minimum contacts between Wisconsin and L'Arciere. *Id.* at 291. I take issue, particularly, with the majority's transformation of what is, at best, a prima facie case into a presumption. The majority states that "[c]ompliance with the statute *presumes* that due process is met." Majority op. at ¶ 22 (citing *Lincoln v. Seawright,* 104 Wis. 2d 4, 10, 310 N.W.2d 596 (1981)). Even if the defendant can rebut that presumption, it is a presumption nonetheless, according to the majority. *Lincoln* stated that compliance with Wisconsin's long-arm statute, Wis. Stat. § 801.05, constitutes prima facie compliance with the requirements of due process. 104 Wis. 2d at 10. *Lincoln,* however, made an unsupported conclusion that the prima facie case somehow constituted a presumption.

[1] In *Zerbel v. H. L. Federman & Co.,* 48 Wis. 2d 54, 60, 179 N.W.2d 872 (1970), this Court recognized that, "[a]s to the limits imposed by due-process standards, federal decisions are controlling." I agree with the majority's conclusion that the five-factor test set forth in *Zerbel* has been subsumed into due process standards adopted by the United States Supreme Court. *See* majority op. at ¶ 23 n.9.

*See id.* This is a grievous error that should not be continued.

¶ 51. More importantly, if compliance with the Wisconsin's long-arm statute presumably established due process, such a presumption, in and of itself, would offend due process.

> The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." Although this protection operates to restrict state power, it "must be seen as ultimately a function of the individual liberty interest preserved by the Due Process Clause" rather than as a function "of federalism concerns."

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471–72 & n.13 (1985) (internal citations omitted). Due process limits a state's power to reach beyond its borders and take jurisdiction of those from outside of its borders. Taking the majority's presumption to its logical end, the legislature could enact a long-arm statute with no limits and then, presumptively, abrogate due process. This cannot be.

¶ 52. Even if the majority's conclusion that Wisconsin's long-arm statute, Wis. Stat. § 801.05(4)(b), applies to L'Arciere's activity is correct, due process indeed limits the reach of personal jurisdiction. The limit of that reach is premised upon one of the most basic of due process rights—notice. Not notice of the impending suit, but notice that one could even be subject to a suit in the forum state.

> When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," it has clear notice that it is subject to suit

there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.

*World-Wide Volkswagen*, 444 U.S. at 297 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Potential defendants must have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King*, 471 U.S. at 472 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). The fair warning requirement is met where the defendant "purposefully directs" its activities towards forum residents. *Burger King*, 471 U.S. at 472, 473.

¶ 53. As the majority acknowledges, "purposeful availment" is the main cord of the minimum contacts analysis. *See* majority op. at ¶ 24. "Purposeful availment" is comprised of a number of interwoven components, one of which is whether the defendant has "purposefully directed" its activities at the forum. It is on this component that a majority of the United States Supreme Court could not agree in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987).[2] In short, Justice O'Connor, speaking for a plurality of four justices, advocated a more restrictive test, by requiring specific acts by which a defendant purposefully directed its activities toward the forum state, in addition to the defendant's awareness *and* placement of a product into the stream of commerce. *Id.* at 112. Justice Brennan, speaking for a plurality of four other justices, disagreed. As the majority of this court

---

[2] The United States Supreme Court has not extensively analyzed the "purposefully directed" component of the due process minimum contacts test since *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102 (1987).

noted (at ¶ 29), Justice Brennan concluded that so long as there is "regular and anticipated flow of products from manufacturer to distribution to retail sale," and the defendant "is *aware* that the final product is being marketed in the forum State," the defendant benefits "from the State's laws that regulate and facilitate commercial activity," including the sale of the product, "the possibility of a lawsuit there cannot come as a surprise." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring). The majority here adopts Justice Brennan's approach, relying upon *Dehmlow v. Austin Fireworks*, 963 F.2d 941 (7th Cir. 1992), even though *Dehmlow* also examined whether the jurisdictional facts satisfied Justice O'Connor's test "in recognition of the recent split of Supreme Court authority on this issue." *Id.* at 947. Nonetheless, assuming, *arguendo*, that Justice Brennan's approach, which pertains to the sales and distribution of goods, rather than providing a service (*see Asahi*, 480 U.S. at 117 (Brennan, J., concurring)), applies here,[3] the exercise of personal jurisdiction in this case would violate due process.

¶ 54. Here, there is nothing that suggests that L'Arciere purposefully directed any activity toward Wisconsin which would establish minimum contacts. It is undisputed that L'Arciere has not, and does not, do business in Wisconsin. It has no office, employees, or property in Wisconsin. It does not advertise or otherwise solicit business in Wisconsin. It did not create or

---

[3] The majority glosses over this point, summarily concluding that the due process analysis from cases which involve strict products liability claims applies here because "Kopke's injuries arose out of commercial activities." Majority op. at ¶ 31. I am not persuaded. Even under the majority's test, which presumably is the one most favorable to its conclusion, exercising personal jurisdiction over L'Arciere runs afoul of due process.

control Binda's distribution system that brought the paper to Wisconsin. Nor is there evidence that L'Arciere processed the paper for its sale in Wisconsin. Binda paid L'Arciere for labor regardless of when, where, or even if the paper was delivered.

¶ 55. The majority relies upon three factors that it concludes establishes L'Arciere's minimum contacts with Wisconsin and each fails to establish such. The first is L'Arciere's contract with Binda. *See* majority op. at ¶ 33.[4] The United States Supreme Court stated clearly in *Burger King* that a contract alone does not establish minimum contacts. 471 U.S. at 478. Moreover, the contract was between two Italian companies. There is no evidence that L'Arciere, at any time, contracted with a Wisconsin company. The fact that L'Arciere employees worked with Binda employees does not establish the requisite awareness that L'Arciere was purposefully making contact with this forum. *See* majority op. at ¶ 33. There certainly does not appear to be any "purposeful availment."

¶ 56. Second, the majority relies upon the loading instructions which "identified the container's destination." Majority op. at ¶ 34. According to the majority, these instructions show that the paper products L'Arciere packed for Binda "were specifically intended to arrive in this forum." *Id.* The loading instructions prove no such thing. These one-page,

---

[4] Also, the majority contends (*id.* ¶ 33), this case is not like *Asahi*. I agree. We do not have before us a manufacturer as the defendant, which shipped the allegedly defective part to another international forum, which, in turn, was incorporated into the product that was shipped into the forum state. *Asahi*, 480 U.S. at 105–107. This distinction, however, is immaterial to L'Arciere's contract with Binda, which hardly establishes a contact with this state.

handwritten instructions detail the calculations of the weight of the containers and sketch the placement of the containers. They also state, "x [to] CTI," "x [to] Appleton," and "x [to] Neenah." Nowhere is there any indication that CTI, Appleton, or Neenah are located in the United States, let alone in Wisconsin.

¶ 57. Third, the majority relies upon evidence that at least 40 containers were loaded by L'Arciere for delivery to Wisconsin. Majority op. at ¶ 35. This evidence comes from damage reports CTI completed when it received the shipments from Binda. *Id.* at ¶ 35. These reports record damage that apparently occurred in shipment, noting where the containers were "scraped," or "dirty," or "corner gouged." However, these reports do not, and could not, establish, *ex post facto*, that L'Arciere was aware that those containers were headed for Wisconsin. It is this thread, L'Arciere's supposed awareness, which, when pulled, unravels the majority's conclusion.

¶ 58. Under either Justice O'Connor's or Justice Brennan's test for whether a defendant has purposefully directed its acts towards the forum state, the defendant must be *aware*, at a minimum, that its product could reach the forum state. *See Asahi*, 480 U.S. at 105; *see also id.* at 117 (Brennan, J., concurring). This relates back to the due process requirement that the defendant must have " 'clear notice that it is subject to suit' in the forum," and that it is thus afforded an "opportunity to 'alleviate the risk of burdensome litigation.' " *Burger King*, 471 U.S. at 476 n.17 (quoting *World-Wide Volkswagen*, 444 U.S. at 297). Awareness exists, for example, where the defendant "delivers its products into the stream of commerce with the *expectation* that they will be purchased by consumers in the

.

forum State." *World-Wide Volkswagen*, 444 U.S. at 298 (emphasis added).

¶ 59. Based on the information presented, it is reasonable to conclude that L'Arciere had neither the awareness nor the expectation that the paper products it packed would be shipped to Wisconsin. There is no indication that L'Arciere knew specifically that some were destined for Wisconsin. None of the loading plans produced by Binda contained the words "Wisconsin" or "U.S.". Other plans refer only to "Neenah," "Appleton," or only to "CTI." As L'Arciere pointed out in its brief before this court:

> There are no less than three Neenahs in the United States (one apiece in Alabama, Virginia, and Wisconsin); two dozen Appletons within and without the United States; and literally hundreds of locations around the world where one may find corporations in whose name the letters "CTI" play a prominent part.

Br. of Def.-Appellant at 27. These references to "Neenah," "Appleton," and "CTI" cannot establish minimum contacts. Also, presumably, had L'Arciere been aware that its packing of paper might "create a 'substantial connection' with" Wisconsin (*Burger King*, 471 U.S. at 475 (citation omitted)), L'Arciere might have procured insurance to alleviate the risk of litigation. *World-Wide Volkswagen*, 444 U.S. at 297. However, it is undisputed that L'Arciere's liability insurance coverage specifically excluded the United States and Canada. L'Arciere, since it appears to have been unaware of the risk, could not assess that risk.

¶ 60. To find the requisite awareness, the majority adopts Kopke's argument that L'Arciere had "constructive knowledge" that the paper was being

shipped to Wisconsin. We should be wary of an attempt to reach beyond the limits of due process based upon such a contention. First, Kopke points to no evidence which would establish that L'Arciere should have known the containers were headed here. Second, and more importantly, the purportedly "analogous" cases are wholly inapposite. *See* majority op. at ¶ 38. *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610 (8th Cir. 1994) and *Oswalt v. Scripto, Inc.*, 616 F.2d 191 (5th Cir. 1980) both involve distribution contracts under which the defendants were reasonably aware, or even expected, that their product would reach the forum state. In *Barone*, the Eighth Circuit found that Nebraska could exercise personal jurisdiction over Hosoya Fireworks Co. of Tokyo, Japan, consistent with due process. 25 F.3d at 610–611. This was due to the distribution agreement Hosoya had with Rich Bros. "Hosoya certainly benefited from the distribution efforts of Rich Bros., and although Hosoya claims to have had no actual knowledge that Rich Bros. distributed fireworks into Nebraska, such ignorance defies reason and could aptly be labeled 'willful' " *Id.* at 613 (footnote quoted by the majority at ¶ 38 omitted).[5] Similarly, in *Oswalt,* the Fifth Circuit found that the

---

[5] It is noteworthy that *Barone* referred to *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660 (7th Cir. 1986), "that appears to be on all fours with the case before" the *Barone* court. *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 612 (8th Cir. 1994). *Giotis* determined that a Wisconsin court would have jurisdiction over Missouri defendants in their role as heads of a distribution network. 800 F.2d at 662, 667–668. *Giotis* explained the economic context of a distribution network, which would give rise to finding that a manufacturer, or seller, should be aware that its product might reach, and thus establish a contact with, any number of states.

defendant should have known that its products would be marketed and sold in the forum state, Texas, based upon the defendant's exclusive distribution arrangement. 616 F.2d at 199–200. "[T]he record shows that [the defendant] had every reason to believe its product would be sold to a nation-wide market, that is, in any or all states." *Id.* at 200. To the contrary here, there is nothing in the record which would have given L'Arciere reason to believe that, due to a distribution agreement it had with a distributor in the United States, the paper it packed would end up in Wisconsin. The cases wherein constructive knowledge established awareness, sufficient to establish personal jurisdiction, rest upon an entirely different relationship between the defendant and the forum state, than the one we have here.[6] That distribution link between L'Arciere and

> [T]he seller-defendant, particularly if at the head of a distribution network, realizes the much greater economic benefit of multiple sales in distant forums, of which the purchase by the particular buyer who has brought suit is merely one example. A seller, since it realizes this greater economic benefit, may more easily satisfy the purposeful availment test and be sued by a buyer in the buyer's forum than a buyer may be sued by the seller in the seller's forum. This is especially true where the seller is at the head of a distribution network and thus even more clearly has "purposefully availed" itself of the economic benefits of selling to buyers in distant forums.

*Id.* at 667 (footnote and citations omitted). Clearly, we do not have this same economic framework here, making the "should have known" test for awareness inapplicable. L'Arciere is not a seller-defendant, and certainly is not at the head of a distribution network.

[6] Visibly missing from the cases relied upon by the majority is a truly analogous case where personal jurisdiction has been exercised over a non-resident defendant, based solely upon that defendant's preparation of goods to be shipped by another to the forum State.

Wisconsin does not exist here. In fact, no meaningful link exists between the two.

¶ 61. The majority attempts to create a link, however, a link through Binda's contacts with Wisconsin. According to the majority,

> L'Arciere, by virtue of its business relationship with Binda, benefited from the distribution of Binda products to this forum. "A defendant who has placed goods in the stream of commerce benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Asahi*, 480 U.S. at 117 (Brennan, J., concurring).

Majority op. at ¶ 36. However, L'Arciere did not benefit economically from the fact that the paper it packed was delivered to Wisconsin. Binda did. L'Arciere economically benefited from packing the paper. L'Arciere did not, in any way, depend upon Wisconsin for any economic benefit. It would have been paid to pack the paper, whether that paper was sent to Wisconsin or to Paris, France, or Paris, Texas. Such is evident from L'Arciere's contract with Binda, which did not specify that its work, or payment, was dependent upon the destination of the cargo. Indeed, L'Arciere failed to " 'purposefully derive [any] benefit' " from Wisconsin. *Burger King*, 471 U.S. at 473.

¶ 62. "[I]t is essential in each case that there be *some act* by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) (emphasis added)). Another strand in the cord of "purposeful availment," in addi-

tion to the defendant's awareness, is the defendant's conduct that indicates that the defendant is availing itself of the benefit of the forum state, so that it would reasonably anticipate litigation there. *Burger King*, 471 U.S. at 474. Here, however, there is admittedly no such conduct by L'Arciere, and the majority refers only to the contract between Binda and L'Arciere, the loading instructions, and the damage reports. *See* majority op. at ¶¶ 33–35.

¶ 63. That the majority is creating a minimum contacts test based upon foreseeability is evident from its reliance upon Kopke's allegation that L'Arciere negligently loaded the pallet containing the paper, which injured Kopke when he opened it. Majority op. at ¶ 31, 33. The premise for the majority's reliance upon Kopke's allegation is that if L'Arciere negligently packed the paper, it was foreseeable that he would be injured in Wisconsin. This approach was plainly rejected by the United States Supreme Court in *World-Wide Volkswagen*. There, the Court held that jurisdiction in Oklahoma cannot be based upon "the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma," even though it had been argued that the injury in Oklahoma was foreseeable because the Audi was mobile. *World-Wide Volkswagen*, 444 U.S. at 295. "If foreseeability were the criterion. . .a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey. . . ." *Id.* at 296 (citation omitted). Indeed, *World-Wide Volkswagen* stands for the proposition that neither injury nor causation establishes personal jurisdiction. An allegation regarding causation is not a jurisdictional fact, and I note that

the majority fails to rely upon any cases in seeming to so hold that it is.

¶ 64. What remains as the contact between L'Arciere and Wisconsin is only the link created by Binda and CTI, specifically that "not insignificant volume of business between CTI and Binda." Majority op. at ¶ 32. The amount of business between two third-parties has never been the basis of a court's exercise of personal jurisdiction. Again, the majority is relying upon a foreseeability minimum contacts test, in order to assert Wisconsin's jurisdiction over L'Arciere, and such an approach is dependent upon L'Arciere foreseeing, or, in the words of the majority, *"expect[ing]"* that the paper it packed "arrive" in Wisconsin. Majority op. at ¶ 32 (emphasis added). However, " 'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen*, 444 U.S. at 295.

> [T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. The Due Process Clause, by ensuring the "orderly administration of the laws," gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

*Id.* at 297 (citations omitted). Here, the requisite foreseeability, inextricably linked to the notice element of due process, is ostensibly missing. There is very little, if anything, that would put L'Arciere on notice that it was handling a product that was intended for Wiscon-

sin. There was nothing that would have led to the prediction that their packing of containers headed for a "Neenah" or an "Appleton" would result in defending an action in Wisconsin, or even in the United States. L'Arciere would have had to have known that Appleton and Neenah were located in Wisconsin. The contact, established only through Binda, "is far too attenuated a contact to justify [this] State's exercise of *in personam* jurisdiction over" L'Arciere. *Id.* at 299.

¶ 65. Even under Justice Brennan's less restrictive stream of commerce test in *Asahi*, the necessary minimum contacts are not found here. The majority, in finding to the contrary, rents the fabric of due process. If, as the majority concludes, the jurisdictional facts in this case establish minimum contacts, little predictability remains for potential plaintiffs and defendants in the present world economy. Perhaps, it is time for the United States Supreme Court again to provide guidance as to the scope of due process as related to minimum contacts. For the reasons stated herein, I respectfully dissent.

¶ 66. I am authorized to state that Justice JON P. WILCOX and Justice DIANE S. SYKES join this dissent.

¶ 67. DIANE S. SYKES, J. *(dissenting).* I join Justice Crooks' dissent. I agree that Wisconsin's long-arm statute, Wis. Stat. § 801.05(4)(b), has been satisfied, but that due process precludes the assertion of personal jurisdiction over L'Arciere. I write separately because I disagree with the majority's adoption of the Seventh Circuit's interpretation of the statute in *Nelson v. Park Industries, Inc.*, 717 F.2d 1120 (7th Cir. 1983).

445

¶ 68. In *Nelson*, the Seventh Circuit held that the statute's reference to "products. . .processed. . .by the defendant [and] used or consumed within this state" included the actions of a foreign distributor who did nothing more than buy and resell goods. *Id.* at 1124. I am not fully convinced that the transactional act of buying and reselling a product in the ordinary course of trade constitutes "processing" for purposes of our long-arm statute. But that issue need not be decided here, and so I would not adopt *Nelson*'s interpretation of the statute.

¶ 69. Instead, I would conclude that the particularized packaging procedure carried out by L'Arciere employees constituted "processing" as that term is commonly and ordinarily understood. "To process" is "to treat or prepare by a special method." *Funk & Wagnalls New International Dictionary of the English Language* 1005 (Comprehensive Millennium Ed. 2000).

¶ 70. L'Arciere employees packaged and secured the paper pallets for shipment in cargo containers according to a detailed method—complete with bracing beams, boards, and inflated air bags—prescribed by Binda's loading plans. This is a form of "processing." As such, the long-arm statute has been satisfied, although the requirements of due process have not, for the reasons stated by Justice Crooks. Accordingly, I join his opinion, and respectfully dissent.

¶ 71. I am authorized to state that Justices JON P. WILCOX and N. PATRICK CROOKS join this dissenting opinion.