**ERAGEN BIOSCIENCES, INC.,**
a Delaware corporation,
Plaintiff,

v.

**NUCLEIC ACIDS LICENSING, LLC, a Florida limited liability company and Steven Benner, an individual, Defendants.**

No. 06–C–305–C.

United States District Court,
W.D. Wisconsin.

Aug. 8, 2006.

OPINION and ORDER

CRABB, District Judge.

On May 18, 2006, defendants Nucleic Acids Licensing, LLC and Steven Benner filed a diversity suit in the United States District Court for the Northern District of Florida seeking a declaration that their AEGIS patent licensing agreement with plaintiff EraGen Biosciences, Inc. is invalid. Plaintiff learned of the suit on May 31, 2006, and three days later filed this lawsuit, contending that the licensing agreement is valid and that defendants have breached it. Jurisdiction is present under 28 U.S.C. § 1332.

Now before the court is defendants' motion to dismiss plaintiff's case for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2) or, in the alternative, to dismiss or stay the case on the ground that plaintiff's claims are substantially similar to claims brought against plaintiff in the action currently pending in the Northern District of Florida. Because I conclude that this court can exercise personal jurisdiction over defendants and that, under the circumstances present here, the "first to file" rule does not bar plaintiff from trying its claims in this court, the motion will be denied. (If defendants are concerned that this court's rulings may conflict with rulings made by the Florida district court, they may move for a transfer of the Florida case to this court, where the two cases may be consolidated and the claims tried in one suit.)

From the facts alleged in the complaint, the exhibits attached to defendants' brief in support of their motion to dismiss, the complaint filed by defendant in the Northern District of Florida and the facts averred in the affidavits submitted by the parties, I find for the sole purpose of deciding this motion that the following facts are undisputed and material. *Purdue Research Foundation v. Sanofi–Syn-*

William A. Wiseman, O'Neil, Cannon Hollman, DeJong S.C., Milwaukee, WI, for Defendants.

*thelabo, S.A.,* 338 F.3d 773, 782 (7th Cir. 2003) (court accepts all well-pleaded allegations in complaint as true, unless controverted by challenging party's affidavits; any conflicts concerning relevant facts are to be decided in favor of party asserting jurisdiction).

## JURISDICTIONAL FACTS

### A. *Parties*

Plaintiff EraGen Biosciences, Inc. is a Delaware corporation with its principal place of business in Madison, Wisconsin. Plaintiff is a biotechnology company that employs 38 people.

Defendant Nucleic Acids Licensing, LLC, is a Florida limited liability company. Its sole member and manager is defendant Steven Benner, who is a citizen of Florida.

### B. *Relationship Between Plaintiff and Defendants*

In 1994, defendant Benner formed Sulfonics, Inc. to develop and market nucleotide technologies he has patented. In 1999, Sulfonics merged with plaintiff EraGen Biosciences, Inc, a merger that resulted in the dissolution of Sulfonics, Inc. Plaintiff entered into four patent licensing agreements with defendant Benner.

In 2001, plaintiff changed its principal place of business from Florida to Wisconsin. Defendant Benner served on plaintiff's board of directors from 1999 until 2003, when he resigned from the board. Prior to his resignation, defendant Benner attended meetings in Wisconsin with members of plaintiff's staff and board on seven occasions.

Over time, a number of disagreements arose between the parties regarding the 1999 licensing agreements. In 2004, after defendant Benner resigned from plaintiff's board of directors, he requested a meeting with the board. The meeting was held in Wisconsin on November 30, 2004. At the meeting, defendant argued that the board should replace its management and restructure its company. The board declined defendant's invitation to restructure its company and instead began discussing with defendant Benner how to handle the disputes that had arisen regarding the 1999 licensing agreements. Ultimately, plaintiff and defendant Benner agreed to replace the 1999 licensing agreements with new ones.

In April 2005, plaintiff and defendants entered into three new licensing agreements, including the AEGIS licensing agreement at issue in this case. Under the terms of the AEGIS agreement, plaintiff was obligated to pay defendant Benner royalties, "diligently prosecute all patent applications with the licensed patents" and "pay all maintenance fees for issued patents." In addition, plaintiff was given the discretionary authority to bring suit against alleged infringers of the licensed patents.

Sometime between September 2005 and February 2006 (the parties do not say when), defendant Benner assigned the AEGIS licensing agreement and related patents to defendant Nucleic Acids Licensing LLC. Section 9.7 of the AEGIS licensing agreement states:

> This Agreement may be freely assigned by either party, provided that the protections and agreements provided by the Releases shall continue to apply to and bind the original parties upon assignment of this Agreement. Change of control of either party shall not affect the validity of this Agreement or either party's rights under this Agreement.

Dkt. # 2, Exh. A, at 14.

Ninety-five percent of plaintiff's business revenue is derived from technologies licensed under the AEGIS agreement.

## C. *Royalty Dispute*

In September 2005, the parties became engaged in a dispute regarding the amount of royalties due to defendant Benner under the AEGIS licensing agreement. Plaintiff alleged that it had overpaid defendant Benner and demanded a refund. Defendant Benner alleged that plaintiff had underpaid him. As a result of the disagreement, on September 7, 2005, defendant Benner notified plaintiff that he considered it to be in breach of the AEGIS agreement and would revoke the agreement effective November 1, 2005, if he did not receive the royalty payment he believed was due.

From September 2005 through the spring of 2006, the parties engaged in negotiations to resolve the dispute. On March 27, 2006, defendants' counsel asked plaintiff for certain documents, indicating that if the requested documents were provided, defendants "believe[d] that th[e] matter c[ould] be resolved." Dkt. #9, Exh. G, at 1. In a letter dated April 6, 2006, plaintiff forwarded the requested documents to defendants. In a second letter to defendants dated the same day, plaintiff's counsel asserted that defendant Benner was misinterpreting the license agreement and had violated his duty of good faith and fair dealing by attempting to terminate the agreement. The second letter ended with the following paragraph:

> In conclusion, the AEGIS license agreement remains in full force and effect, and Dr. Benner's alleged termination is without basis in law or fact. If Dr. Benner persists in making unfounded and legally unsupportable claims regarding the status of the AEGIS license agreement—statements that obviously have a disruptive and potentially destabilizing influence on EraGen and its business relationships—these issues will regrettably need to be sorted out in litigation.

Dkt. #2, Exh. J, at 2. On May 15, 2006, plaintiff wrote defendants a third letter, asking to know whether "Dr. Benner w[ould] agree to repay the amount [allegedly] overpaid and, if not, the basis for his refusal to do so." Dkt. #9, Exh. J.

On May 18, 2006, defendants filed suit in the United States District Court for the Northern District of Florida seeking a declaratory judgment that the AEGIS license agreement is invalid. Plaintiff received notice of the lawsuit on May 31, 2006, when defendant Nucleic Acids Licensing sent a copy of the complaint to plaintiff's counsel. Three days later, on June 2, 2006, plaintiff filed the present lawsuit, requesting declaratory relief that the license agreement is valid and monetary relief for defendants' alleged breach of the duty of good faith and fair dealing.

## OPINION

### A. *Personal Jurisdiction*

The threshold question in this case is whether this court may exercise personal jurisdiction over defendants. A federal court has personal jurisdiction over a non-consenting, nonresident defendant if a court of the state in which that court sits would have jurisdiction over the lawsuit. *Giotis v. Apollo of the Ozarks, Inc.*, 800 F.2d 660, 664 (7th Cir.1986). Under Wisconsin law, determining whether personal jurisdiction may be exercised requires a two-step inquiry. First, the court must determined whether defendants are subject to jurisdiction under Wis. Stat. § 801.05, Wisconsin's long-arm statute. *Kopke v. A. Hartrodt S.R.L.*, 2001 WI 99, ¶8, 245 Wis.2d 396, 629 N.W.2d 662. Then, if the statutory requirements are satisfied, the court must consider whether the exercise of jurisdiction comports with due process requirements. *Id.* Plaintiff bears the minimal burden of making a *prima facie* showing that constitutional

and statutory requirements for the assumption of personal jurisdiction are satisfied. *Id.*

### 1. *Wis. Stat. § 801.05*

Wisconsin's jurisdictional statute, Wis. Stat. § 801.05, authorizes courts in the state to exercise jurisdiction over nonresident defendants in certain specified circumstances. Plaintiff asserts that three separate provisions of the statute provide a ground for exercise of personal jurisdiction over defendants: §§ 801.05(1)(d), (5)(b) and (5)(e).

■ Section 801.05(1)(d) authorizes Wisconsin courts to exercise personal jurisdiction over a defendant for any purpose, if at the time the action is commenced the defendant was "engaged in substantial and not isolated activities within this state, whether such activities are wholly interstate, intrastate, or otherwise." Generally, a defendant will be found to have "substantial and not isolated" contacts with the state if he has "solicit[ed], create[d], nurture[d], or maintain[ed], whether through personal contacts or long-distance communications, a continuing business relationship with anyone in the state." *Stauffacher v. Bennett*, 969 F.2d 455, 457 (7th Cir. 1992).

■ Plaintiff contends that defendants have "solicited, created, nurtured and maintained" a business relationship with it over the course of the past seven years. From plaintiff's creation in 1999 until 2003 (two years after its move to Wisconsin), defendant Benner was a member of plaintiff's board of directors. He attended numerous meetings with plaintiff's board and staff in Wisconsin. Following his resignation from plaintiff's board, defendant Benner renegotiated licensing contracts with plaintiff and tried to persuade it to restructure the company in order to engage in further business with him. These Wisconsin contacts were neither isolated nor insubstantial. Because defendant Benner "solicit[ed], create[d], nurture[d and] maintain[ed] ... a continuing business relationship" with plaintiff, *Stauffacher*, 969 F.2d at 457, he falls within the reach of Wisconsin's long arm statute

■ But what about defendant Nucleic Acids Licensing? Plaintiff treats each defendant as interchangeable, attributing Wisconsin contacts allegedly made by defendant Benner to defendant Nucleic Acids Licensing. The reason for this is rather obvious: as the sole partner of his limited liability company, defendant Benner *is* defendant Nucleic Acids Licensing. Because defendant Nucleic Acids Licensing has no agent other than defendant Benner, the only way it can have contacts with Wisconsin or any other state is through defendant Benner. Nevertheless, by conflating defendant Benner's actions with those of defendant Nucleic Acids Licensing, plaintiff overlooks a key distinction: defendant Benner did not assign his interest in his patents to defendant Nucleic Acids Licensing until the fall of 2005 (at the earliest), *after* Benner's direct personal contacts with Wisconsin are alleged to have occurred. Because defendant Nucleic Acids Licensing did not exist at the time defendant Benner made his visits to Wisconsin, any actions taken by defendant Benner prior to the establishment of Nucleic Acids Licensing may not be attributed to defendant Nucleic Acids Licensing.

■ If defendant Benner's visits to Wisconsin do not provide a basis for finding that § 801.05(1)(d) authorizes this court to exercise personal jurisdiction over defendant Nucleic Acids Licensing LLC, the question is whether another source for exercising personal jurisdiction over this defendant exists. Section 801.05(5)(b) gives a Wisconsin court personal jurisdiction over any action that "arises out of ... services actually performed for the defen-

dant by the plaintiff within this state if such performance within this state was authorized or ratified by defendant." Plaintiff contends that by paying maintenance fees for the patents covered by the AEGIS licensing agreement and by making royalty payments to defendants, as required under the agreement, it performed services for both defendants.

When a defendant authorizes a Wisconsin plaintiff to perform services on its behalf, § 801.05(5)(b) gives a court personal jurisdiction over any conflict that arises out of the performance or non-performance of those services. Although the dispute in this case involves royalty payments primarily, the parties disagree about whether plaintiff performed other obligations under the licensing agreement, including making required maintenance payments. Because the terms of the agreement require plaintiff to provide ongoing services to defendant Nucleic Acids Licensing LLC, by prosecuting its patents, paying maintenance fees for the licensed patents and potentially bringing suit against alleged infringers of the licensed patents, the agreement authorizes plaintiff to perform services on defendant's behalf. Consequently, the Wisconsin long arm statute reaches defendant Nucleic Acids Licensing LLC under § 801.05(5)(b).

### 2. Due process

■ Finding that defendants' activities come within the reach of the state's long-arm statute is just the first of a two-part inquiry. The second step requires a finding that exercise of jurisdiction over them would not violate their due process rights. *Kopke*, 2001 WI 99, ¶ 8, 245 Wis.2d 396, 629 N.W.2d 662. Personal jurisdiction comes in two forms: general and specific. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In this case, plaintiff contends that this court may exercise spe-

cific jurisdiction over defendants because the suit arises out of or is related to defendants' contacts with Wisconsin, namely, through Benner's ongoing relationship with plaintiff and through the obligations imposed on the parties by the terms of the AEGIS licensing agreement.

■ To establish specific jurisdiction, the court must be able to find that defendant "purposefully established minimum contacts in the forum State," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and then consider those contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* at 476, 105 S.Ct. 2174 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 320, 66 S.Ct. 154, 90 L.Ed. 95 (1945)); *Jennings v. AC Hydraulic A/S*, 383 F.3d 546, 549 (7th Cir.2004).

■ By itself, an individual's contract with an out-of-state party does not automatically establish sufficient minimum contacts to support personal jurisdiction by the out-of-state party's home forum. *Burger King Corp.*, 471 U.S. at 478, 105 S.Ct. 2174. However, a contract may be evidence of "prior business negotiations with future consequences which themselves are the real object of the business transaction." *Id.* at 479, 105 S.Ct. 2174. These "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing ... must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Id.* With respect to interstate contractual obligations, the Supreme Court has "emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other

State for the consequences of their activities." *Id.* at 473, 105 S.Ct. 2174 (citing *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 94 L.Ed. 1154 (1950)).

In this case, due process requirements are easily satisfied. Defendant Benner's solicitation, creation and maintenance of an ongoing business relationship with plaintiff, a Wisconsin "citizen," and his efforts to maintain and increase that business through letters, telephone calls and visits to the state are evidence of his "purposeful availment" of the privilege of conducting business within Wisconsin. His contacts were not "random," "fortuitous" or "attenuated." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984).

With respect to defendant Nucleic Acids Licensing, due process is satisfied as well. The Court of Appeals for the Federal Circuit has discussed at length the circumstances in which a licensing agreement may provide a ground for the exercise of personal jurisdiction over a licensee who becomes involved in a patent suit. Although the parties in this case are embroiled in a contract dispute, patent infringement cases remain instructive to the extent that they focus on the effect patent license terms may have on courts' exercise of personal jurisdiction over diverse parties.

Most helpful to resolution of this case is *Akro Corp. v. Luker*, 45 F.3d 1541, 1549 (Fed.Cir.1995), in which the court of appeals found that a district court could exercise personal jurisdiction over a California defendant under Ohio's long arm statute and the Fifth Amendment's due process clause. (In this case, the due process guarantee of the Fourteenth Amendment applies because unlike the patent dispute in *Akro*, this case involves a state contract dispute. Nevertheless, the due process analysis remains the same. *Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1350 (Fed.Cir. 2002).) In *Akro*, an out-of-state defendant had mailed "cease and desist" letters to the plaintiff's Ohio address for a period of three years, asserting that the defendant had entered into an exclusive license agreement with one of the plaintiff's competitors, which was also an Ohio corporation. *Id.* at 1542–43. The license agreement, in addition to specifying royalty payment terms, granted the licensee the power to litigate infringement suits on the defendant's behalf and also required the defendant to "defend and pursue any infringements against his patent." *Id.* at 1543. In determining whether the defendant could be forced to litigate in Ohio, the court "looked to the defendant's relationship with its exclusive licensee to determine the extent of the defendant's forum state contacts." *Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.*, 444 F.3d 1356, 1365 (Fed.Cir.2006) (summarizing *Akron*). Because the defendant had created continuing obligations "beyond the mere receipt of royalty income" in the forum state through the terms of its licensing agreement, the Ohio court had personal jurisdiction over the defendant.

▮ The general rule is that personal jurisdiction does not exist when a defendant has successfully licensed a patent in the forum state but has not exercised control over the licensees' sales activities and has no dealings with those licensees beyond the receipt of royalty income. *Breckenridge Pharmaceutical, Inc.*, 444 F.3d at 1366 (citing *Red Wing Shoe Co. v. Hockerson–Halberstadt, Inc.*, 148 F.3d 1355, 1357–58 (Fed.Cir.1998)). "In contrast, [a] defendant is subject to personal jurisdiction in the forum state by virtue of its relationship with [an] exclusive forum state

licensee if the license agreement ... grants the licensee the right to litigate infringement claims." *Id.* (citing *Akro*, 45 F.3d at 1546.)

The licensing agreement at issue in this case is materially indistinguishable from the agreement in *Akron* that was found to satisfy the due process "minimum contacts" requirement for establishing personal jurisdiction. Under the terms of the AEGIS agreement, plaintiff is required not only to pay royalties to defendants, but to "diligently prosecute all patent applications with the licensed patents" and "pay all maintenance fees for issued patents." In addition, like the licensee in *Akron*, plaintiff has authority to bring suit against alleged infringers of defendants' licensed patents. Although plaintiff entered the agreement with defendant Benner in 2005, Benner later assigned his interest in the licensed patents to defendant Nucleic Acids Licensing LLC.

■ In determining whether it would offend "traditional notions of fair play and substantial justice," *International Shoe*, 326 U.S. at 316, 66 S.Ct. 154 (citation omitted), to assert personal jurisdiction over a nonresident defendant, courts look at

> (1) the forum state's interest in adjudicating the dispute; (2) the plaintiff's interest in obtaining convenient and effective relief; (3) the burden on the defendant; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and, (5) the shared interest of the several States in furthering fundamental substantive social policies.

*Kopke,* 2001 WI 99, ¶ 39, 245 Wis.2d at 427, 629 N.W.2d at 677 (citing *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987); *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

The state of Wisconsin has an interest in providing its citizens with a forum in which to adjudicate their claims arising here; plaintiff has an obvious interest in obtaining convenient and effective relief. Subjecting defendants to personal jurisdiction in this state is not an undue burden, given defendant Benner's sustained contacts with plaintiff from its move to Wisconsin in 2001 until the present time, a period in which the parties were trying to make their business relationship successful.

With respect to the final two factors that must be considered, defendants have not shown that the exercise of personal jurisdiction over them would have an adverse effect on the interstate judicial system's interest in obtaining the efficient resolution of controversies or the shared interest of the states in furthering fundamental substantive social policies. If anything, concerns of efficiency favor resolving the dispute in this court, with its less crowded docket. Although defendants emphasize that Florida law governs their licensing agreement with plaintiff, they do not suggest that the law is unclear or would otherwise be so difficult that litigating the case in a Florida district court would be more likely to yield a sound result.

Because defendant Benner "has availed himself of the privilege of conducting business [in Wisconsin] and because his activities are shielded by the 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. 2174 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). Similarly, because defendant Nucleic Acids Licensing LLC has reaped the benefits of the obligations imposed on plaintiff by the licensing agreement (however limited it may now believe those benefits to be),

exercising personal jurisdiction over defendant would comport with "traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and therefore does not violate the company's due process rights.

### B. *"First to File" Rule*

▬ When a federal suit is duplicative of a parallel action already pending in another federal court, the suit may be stayed, transferred or dismissed in the interest of wise judicial administration. *See, e.g., Serlin v. Arthur Andersen & Co.,* 3 F.3d 221 (7th Cir.1993) (dismissing duplicative lawsuit). In this circuit, the general rule is that "when comity among tribunals justifies giving priority to a particular suit, the other action should be stayed, rather than dismissed, unless it is absolutely clear that dismissal cannot adversely affect any litigant's interests." *Central States, Southeast and Southwest Areas Pension Fund v. Paramount Liquor Co.,* 203 F.3d 442, 444 (7th Cir.2000) (citing cases). In such instances, a district court has "an ample degree of discretion" in deferring to another federal proceeding involving the same parties and issues. *Trippe Mfg. Co. v. American Power Conversion Corp.,* 46 F.3d 624, 629 (7th Cir.1995) (citing *Kerotest Mfg. Co. v. C–O–Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)). When parallel cases involve the same subject matter, it is desirable for a district court to resolve both suits in a single forum for the sake of judicial economy. *Handy v. Shaw, Bransford, Veilleux & Roth,* 325 F.3d 346, 349 (D.C.Cir.2003) (citing *Kerotest Mfg. Co.,* 342 U.S. at 183, 72 S.Ct. 219). The question, then, is which forum should adjudicate the dispute.

▬ In determining whether actions should be dismissed, transferred, stayed or adjudicated when similar litigation is pending in other federal courts, courts often apply the "first to file" rule, as defendants urge the court to do in this case. Under the rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap. *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999). Defendants urge this court to dismiss or stay any further proceedings in this case in order to permit full litigation of their first-filed suit in the Northern District of Florida.

Although the timing of a lawsuit is one factor to consider when deciding whether to adjudicate a second-filed action, the Court of Appeals for the Seventh Circuit has stated repeatedly that this circuit has never adhered rigidly to the "first to file" rule, *Tempco Elec. Heater Corp. v. Omega Engineering, Inc.,* 819 F.2d 746, 750 (7th Cir.1987), and is concerned instead "with whether or not the declaratory relief sought will more fully serve the needs and convenience of the parties and provide a comprehensive solution of the general conflict," *Tamari v. Bache & Co. (Lebanon) S.A. L.,* 565 F.2d 1194, 1203 (7th Cir.1977) (citing 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2758 at 779 (1973)). The court has explained:

No mechanical rule governs the handling of overlapping cases. Judges sometimes stay proceedings in the more recently filed case to allow the first to proceed; sometimes a stay permits the more comprehensive of the actions to go forward. But the judge hearing the second-filed case may conclude that it is a superior vehicle and may press forward. When the cases proceed in parallel, the first to reach judgment controls the other, through claim preclusion (*res judicata* ).